STATE OF CONNECTICUT *v.* JOHN DENBY
(12182)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued October 10—decision released December 10, 1985

*Donald D. Dakers,* public defender, for the appellant (defendant).

*Julia D. Dewey,* assistant state's attorney, with whom, on the brief, were *Arnold Markle,* state's attorney, and *Robert J. Devlin, Jr.,* assistant state's attorney, for the appellee (state).

DANNEHY, J. The defendant was charged with assault in the first degree in violation of General Statutes

§ 53a-59 (a) (1). After a jury trial, he was acquitted of that charge but convicted of the lesser offense of assault in the second degree in violation of General Statutes § 53a-60. The defendant's sole claim of error on appeal is that the trial court erred in limiting his cross-examination of the victim of the assault. We agree with the defendant that the trial court improperly restricted cross-examination, but we find that the error was harmless. Thus, we affirm the conviction.

Jerome Washington was the victim of the assault. He testified that for about one month prior to the incident he had been staying with his cousin, Christine Maynard, at her New Haven apartment. Washington, who lived in Ansonia, knew that the Ansonia police had a warrant for his arrest in connection with a robbery that had occurred just before he moved to his cousin's apartment. The defendant was Christine Maynard's boyfriend and a frequent overnight guest at her apartment. Washington testified that on the evening of March 6, 1981, he was alone in the apartment when the defendant and a companion entered and accused him of stealing the defendant's gun. Washington denied taking the gun and tried to remonstrate with the defendant. Washington testified that the defendant, who was standing approximately fifteen feet away, suddenly produced a handgun: "He just shot me, and I didn't know I was shot the first time. I kept talking. I got shot again. So I hit the floor. He might try to shoot me again." Washington suffered two bullet wounds in his leg and spent more than two weeks in the hospital.

The defendant gave a different version of the incident. He stated that for about one year he had been sharing the apartment in question with Christine Maynard. He testified that on the morning of August 6, 1981, he looked in the closet where he kept his gun and found that it was not there. He immediately suspected that Washington had stolen it. He got into his car and

drove to various locations in New Haven to look for Washington, picking up several friends along the way. The defendant did not find Washington. When he returned to the apartment later that evening, Washington was there. The defendant testified that he and a companion each grabbed one of Washington's arms in an attempt to subdue him and recover the gun. The defendant testified, "Dewey had him like this, and I had him like this. I went like this. (Indicating). I said, 'I feel the gun,' and I was trying to pull the gun out of him, right; and when I was pulling the gun, I think he grabbed like that, (Indicating) and I pulled the gun. The gun went off two times right there." According to the defendant, he then removed the gun from Washington's waist and departed with his companion.

On direct examination, Washington admitted that, shortly after the incident in question, he himself had been convicted of an unrelated robbery in Ansonia, and, as a result, had served a term of imprisonment in Somers. On cross-examination, defense counsel sought to learn more about Washington's robbery conviction. He first established that the conviction had been for robbery in the first degree. He next attempted to ascertain when the robbery occurred, and whether Washington possessed a handgun during the robbery. In response to the first question, which was propounded several times, Washington testified that he could not remember when the robbery occurred. Asked whether he possessed a handgun during the robbery, Washington responded that he had not. The state's attorney immediately objected to further questioning into this matter on the ground that "getting into the details of the crime is improper." The trial court sustained the objection, apparently ruling that Washington's robbery conviction was relevant only to

credibility. The entire sequence is reproduced in the footnote.[1]

It is a common trial tactic, employed by both the state and the defense, to introduce on direct examination the prior convictions of one's own witness. The obvious pur-

---

[1] The following questions were asked of the victim by defense counsel.

"Q. Mr. Washington, let me clarify one thing. You indicated that you had been convicted of the charge of robbery, is that correct?

"A. Yeah, right. Yes.

"Q. This incident that you testified about occurred sometime, you said, I believe, in 1981, is that correct?

"A. Yeah.

"Q. Now, you don't recall what time in 1981 this was? Is that your testimony?

"A. What's that?

"Q. Is your testimony that you don't remember when in 1981 this happened to you that you got shot?

"A. It was in the summer.

"Q. In the summer of 1981?

"A. Yeah.

"Q. And by 'the summer'—

"A. I think it was. I can't remember, though, cause I go through too much emotional problems. I can't remember.

"Q. Did you go through emotional problems back in the summer of 1981?

"A. What do you mean by that?

"Q. What do you mean by it?

"A. What I'm saying—What I'm saying is that's something I don't want to remember, something I'm trying to wipe out of my mind.

"Q. You mean this incident that occurred to you, getting shot, has caused you, since that time, emotional problems? Is that your testimony?

"A. I don't understand what you are saying.

"Mr. Dakers: Could you read back—Excuse me. Could you read back his response to my first question because I thought he testified that he had emotional problems and couldn't remember. Is that correct? I don't remember what he said.

"The Court: Read the first question and the response.

(Whereupon, the pertinent questions and answers were read back by the court reporter.)

"The Court: Next question.

"Q. Are the emotional problems that you referred to something that has occurred since the time you were shot?

"A. No. It's—Well, I don't think back that far. I can't remember back that far.

poses of this maneuver are to avoid the appearance that the witness is attempting to conceal the conviction from the jury, and to preclude the opposing party from reaping any advantage which may accrue from exposing

"Q. In other words, in the summer of 1981, or at or about the time you were shot—let's call it that—did you encounter the same emotional problems?

"A. I still don't understand what you're saying.

"Q. Do you have emotional problems?

"A. Yes.

"Q. In what way do you have emotional problems? What do you mean by that?

"A. I got high blood pressure and my nerves.

"Q. And how do those symptoms affect you?

"Mr. Devlin: Well, objection, unless we're talking about at the time of the incident.

"Mr. Dakers: I'm trying to find out if, in fact, whatever these emotional problems are—

"The Court: Overruled. Read the question to the witness.

(Whereupon, the pertinent question was read back by the court reporter.)

"A. I don't really know. If I knew, I wouldn't have to be going to the doctor all the time.

"Q. But you experienced these emotional problems prior to the time that you were shot, is that correct?

"A. No. I've been having them.

"Q. And you'd been having them before you were shot, is that correct?

"A. Yes. Yes, sir.

"Q. And whatever they are, you had them at the time that you were shot, is that correct?

"A. Yes.

"Q. Now, you can't recall specifically the date that you were shot?

"A. I can't recall if it was in the summer or the winter.

"Q. Whether it was in the summer or the winter of 1981?

"A. No, I can't recall what it was.

"Q. But I think Mr. Devlin asked you on direct examination, some time after this incident, the shooting, your being shot, you were arrested for a robbery or convicted of a robbery, is that correct?

"A. Yes.

"Q. Now, first of all, was that a robbery in the first degree?

"A. I can't remember that.

"Q. Are you the same gentleman that was convicted of robbery in the first degree on March 17 of 1981?

"A. Yes. I did some time for it, too.

"Q. Now, when did you go to Somers Prison for this robbery in the first degree?

the indiscretions of one's adversary. *State* v. *Nardini,* 187 Conn. 513, 527, 447 A.2d 396 (1982). In the present case, the state's attorney obviously proceeded on the assumption that the evidence of Washington's robbery

"A. I didn't go straight to Somers. They had me at Whalley Avenue.

"Q. When you were arrested for the crime of robbery in the first degree?

"A. After I got out of the hospital—I didn't get out of the hospital. They arrested me in the hospital.

"Q. So at the time you were in the hospital recovering from being shot, you were arrested for the crime of robbery in the first degree by the New Haven Police Department?

"A. No.

"Q. Okay. Then what?

"A. Ansonia, I think, came and got me, Ansonia Police.

"Q. You were arrested by the Ansonia Police Department for the crime of robbery in the first degree while you were in the Yale-New Haven Hospital recovering from being shot, is that correct?

"A. Right.

"Q. So that when you recovered from this incident, did you go directly to jail?

"A. Yes.

"Q. And the reason you went to jail was because you hadn't made bond on the robbery in the first degree—

"A. Yes.

"Q.—for which you were arrested while you were at Yale-New Haven Hospital, is that correct?

"A. Yes.

"Q. Now, when did that robbery in the first degree occur?

"Mr. Devlin: I'm going to object, your Honor. I think we're a little far afield here on that.

"The Court: Do you claim it?

"Mr. Dakers: I do, your Honor. I claim it because of two reasons: One, because I was under the impression from direct examination that he had committed a robbery at some time after this incident, when apparently it is before, and I want to clarify when that was. Second of all, if he in fact had pending a robbery arrest, it may be that this would influence his testimony in this case and to the police at the time he was in the hospital. I think it's a matter that might affect his credibility even as to the statements he made back in the hospital whenever it was in 1981 that he was shot, and I think it's appropriate—

"Mr. Devlin: He already testified he wasn't arrested until he was at the hospital, released from the hospital and arrested then. So I don't see where that second ground cuts any—I'll withdraw my objection specifically as to the date, but I'll renew it if we get further into this.

"The Court: Next question.

conviction would be admissible, on cross-examination, only to impeach Washington's credibility through the indirect inference arising from general bad character. *State* v. *Geyer,* 194 Conn. 1, 12, 480 A.2d 489 (1984); *State* v. *Carter,* 189 Conn. 631, 644, 458 A.2d 379 (1983); *State* v. *Nardini,* supra, 523–24. The trial court apparently agreed, and therefore precluded the defendant from probing further into the details of the robbery conviction. Prior convictions, when offered to impeach credibility through the inference of general bad character, may be proved either by questioning the

---

"Q. When did the incident occur, the robbery occur, for which you were arrested at the hospital?

"A. I don't know, I can't remember.

"Q. You don't know?

"A. No, sir.

"Q. Do you remember the incident at all?

"A. No, I don't.

"Q. You know you were convicted of a robbery in the first degree?

"A. I know that.

"Q. You know that you were sentenced to Somers?

"A. Yes.

"Q. But you have no idea when that robbery occurred?

"A. No, I don't.

"Q. Do you know what the allegations were against you? Were you charged and convicted of possession of a pistol in this robbery?

"A. No.

"Mr. Devlin: Objection, your Honor. I'm going to object because I think getting into the details of the crime is improper, and I would object to it.

"Mr. Dakers: I would say it's completely relevant, your Honor, because a robbery in the first degree—for me to be aware that this witness was convicted of a felony, more specifically, a robbery in the first degree, and if that robbery occurred at or around the time of this incident and involved the possession of a handgun, I think it is extremely appropriate to this case.

"The Court: Objection sustained.

"Mr. Dakers: Exception, your Honor?

"The Court: Exception noted.

"Q. You don't recall when you committed the crime of robbery in the first degree, is that correct?

"A. I was—I had said that I did that. You see, when I went to court for that, a lot was behind that.

"Mr. Devlin: I object to this, your Honor.

"A. (continuing) A lot was behind that.

witness or by introduction of a certified copy of the judgment reflecting the conviction. The facts underlying that conviction are generally inadmissible. See *State* v. *Geyer,* supra, 8; *State* v. *English,* 132 Conn. 573, 580, 46 A.2d 121 (1946); see also Tait & LaPlante, Connecticut Evidence (1976) § 7.21 (d); McCormick, Evidence (2d Ed.) § 43, p. 88.

In the present case, however, the defendant argued at trial that the robbery conviction was relevant not only to Washington's character for veracity, but also

"Mr. Devlin: The answer is not responsive, number one; and I think the question was 'when,' and I don't think that was responsive to 'when.'

"The Court: I'll treat it as a motion to strike and grant it.

"Q. You pled guilty to the crime of robbery in the first degree at some point, is that correct?

"A. Yes.

"Q. Did you know, at the time you pled guilty to the crime of robbery in the first degree, when that robbery was supposed to have occurred?

"A. No, sir, I didn't.

"Q. You just pled guilty to a robbery in the first degree, not even knowing when the robbery occurred, is that correct?

"A. There was a lot behind that.

"Q. There was a lot behind that?

"A. Yes, there was, sir.

"Q. But you are telling us now that you didn't commit this robbery for which you pled guilty?

"Mr. Devlin: Objection, your Honor. I think you struck the answer to the question which got into that, and I don't think that's a proper inquiry. I think this goes—The inquiry regarding this robbery, which you've heard about twenty-five times now in Mr. Dakers' questioning, is abusing it to some extent, and I would object.

"Mr. Dakers: I would submit, your Honor, that the entire case rests upon the credibility of this witness and the believability of what he has said, and I would submit to your Honor that if he is stating—On direct, it was brought out he was convicted of the crime of robbery in the first degree.

"The Court: For a limited purpose which is well-known to you.

"Mr. Dakers: Yes, your Honor. I have an opportunity, it seems to me, since that is appropriate indication to the jury of credibility, to explore the credibility of this witness in what he perceives to have been whether he was properly convicted of that robbery in the first degree.

"The Court: Objection sustained.

"Mr. Dakers: Exception, your Honor?

"The Court: Exception noted."

to the question of who initially possessed the handgun which caused Washington's injuries. This question was obviously relevant to the central factual issue presented by the evidence. According to the state's theory of the case, the defendant shot Washington from across the room with the intent to cause serious physical injury. General Statutes § 53a-59 (a) (1). In contrast, the defendant testified that the gun discharged accidently as he attempted to remove it from Washington's person. The jury was required to decide between these conflicting versions, and it certainly would assist that decision to know that the victim possessed a handgun shortly before the incident occurred.

While evidence of a prior conviction may be admissible as character evidence to impeach credibility, it may also be admissible as directly relevant to a material issue in the case. *State* v. *Geyer,* supra, 6; *State* v. *McDermott,* 190 Conn. 20, 25, 458 A.2d 689 (1983); see *State* v. *Braman,* 191 Conn. 670, 676–77, 469 A.2d 760 (1983). Evidence that the victim carried a handgun approximately one month before he was allegedly shot by the defendant would be relevant to test the credibility of his testimony that he did not possess a handgun on the evening of the shooting. "Cross-examination, in quest for the truth, provides a means for discrediting the testimony of a witness. 'When pursued for that purpose, the examination frequently and legitimately enters into matters collateral to the main issues.' *Hirsch* v. *Vegiard,* 137 Conn. 302, 304, 77 A.2d 85 (1950). Matters which might not be strictly relevant on direct examination may be so on cross-examination where that matter is explored for the purpose of credibility. Given that function of cross-examination in shedding light on the credibility of the witness' direct testimony, '[t]he test of relevancy is not whether the answer sought will elucidate any of the main issues, but whether it will to a useful extent aid the court or

jury in appraising the credibility of the witness and assessing the probative value of the direct testimony.' McCormick, Evidence (2d Ed.) § 29." *State* v. *Ouellette,* 190 Conn. 84, 102, 459 A.2d 1005 (1983). We find that the trial court did not allow the defendant sufficient latitude on cross-examination to inquire whether Washington possessed a handgun during the commission of the robbery for which he was convicted.

Our inquiry does not end with the conclusion that the trial court improperly limited cross-examination of the state's witness. We now consider whether the trial court's ruling was so prejudicial to the rights of the defendant as to deprive him of a fair trial. *State* v. *Ruth,* 181 Conn. 187, 196–97, 435 A.2d 3 (1980). Stated another way, the question is "whether the claimed erroneous action of the court would have been likely to affect the result." *State* v. *McClain,* 171 Conn. 293, 300, 370 A.2d 928 (1976). Because the claim does not involve the violation of a constitutional right, the burden lies with the defendant to demonstrate the harmfulness of the error. *State* v. *Talton,* 197 Conn. 280, 290, 497 A.2d 35 (1985).

We do not find that the trial court's improper restriction of the defendant's cross-examination of Washington was harmful under the circumstances of this case. Significantly, the defendant claimed that he owned the handgun which shot Washington, and that Washington had stolen the gun from him earlier that day. Thus, there was no claim that the gun which Washington may have possessed during the robbery was the same gun that he possessed on the evening that he was shot. Moreover, defense counsel conceded at oral argument that he should have made an offer of proof showing that Washington, in fact, possessed a handgun during his commission of the earlier robbery. That no such offer was made suggests that counsel could not offer any extrinsic evidence which might have established Washington's possession of a handgun during the rob-

bery. And finally, although cross-examination was improperly restricted, the answers that Washington gave to questions which were allowed indicate that he would not have admitted possession of a handgun even if the matter were pursued further. When asked on cross-examination why he "just pled guilty to a robbery in the first degree, not even knowing when the robbery occurred," Washington responded that "[t]here was a lot behind that." Later, on recross-examination, when asked again if he possessed a weapon on the evening that he was shot, Washington answered that he had never carried a weapon in his life. When counsel immediately asked whether he had ever "been convicted of a crime involving a weapon," Washington answered that he had been "convicted of a crime involved in [sic] a weapon, but I never carried one." On this record it appears unlikely that Washington would have admitted possession of a handgun, unless confronted with extrinsic evidence to the contrary.[2]

---

[2] The relevant portion of recross-examination of the victim by defense counsel follows:

"Q. I'll ask you again, Mr. Washington. I think I asked you this yesterday, or you volunteered it. At the time of the shooting, it's your testimony that you were not in possession of a weapon, is that correct?

"A. At the time of the shooting?

"Q. When you got shot, when you were shot, you didn't have a weapon, is that correct?

"A. You see, I never carried no kind of weapon in my life.

"Q. You never carried a weapon?

"A. Never carried a weapon.

"Q. You've never been convicted of a crime involving a weapon?

"A. I have been convicted of a crime involved in [sic] a weapon, but I never carried one.

"Q. You never carried a weapon?

"Mr. Devlin: I'm going to object, your Honor, because I think the original question was relevant as to the night in question. In terms of other time frames, I would object.

"The Court: That objection is sustained. The question and answer may be stricken.

"Q. You did not have in your possession that evening, the night that you were shot, a weapon?

"A. No.

"Q. A handgun?

"A. No."

We do not believe that the defendant has met his burden of demonstrating the harmfulness of the trial court's erroneous ruling. *State* v. *Talton,* supra. Therefore, it is unnecessary to order a new trial.

There is no error.

In this opinion the other judges concurred.