STATE OF CONNECTICUT *v.* ROBERT SAURIS
(14417)

PETERS, C. J., CALLAHAN, BERDON, NORCOTT and KATZ, Js.

Argued March 30—decision released August 24, 1993

*Louis S. Avitabile,* special public defender, with whom, on the brief, was *Meryl Anne Spat,* for the appellant (defendant).

*John A. East III,* deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly,* state's attorney, and *Bradford J. Ward,* supervisory assistant state's attorney, for the appellee (state).

NORCOTT, J. After a jury trial, the defendant, Robert Sauris, was convicted of the crime of murder in violation of General Statutes § 53a-54a (a).[1] Subsequently, he was sentenced to a term of imprisonment of forty years. The defendant appeals from the judgment of conviction, claiming that the trial court improperly: (1) denied his postverdict motion for judgment of acquittal because there was insufficient evidence from which the jury could find the defendant guilty beyond a reasonable doubt; (2) denied his motions to exclude as irrelevant evidence of sneaker prints, a fingerprint, a pharmacy receipt and red shirt fibers; (3) limited the defendant's impeachment of a state's witness with prior convictions; and (4) found, at a probable cause hearing prior to trial, that there was probable cause that the defendant had murdered the victim. We affirm the judgment.

The jury reasonably could have found the following facts. On Tuesday, May 15, 1990, at approximately 9:30 a.m., Joseph Gerald (Gerry) Deziel and his brother,

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person."

Richard Deziel went to the home of the victim, Joseph Sylvestro, located at 49 Pine Ridge Drive in Wolcott. Sylvestro was a sixty-nine year old widower who lived alone. The purpose of the visit was to finalize arrangements for a trip to Florida that the victim and the Deziel brothers were to make within the next few days.

Upon arriving at the house, the Deziel brothers saw the victim's car in the driveway but found that the doors and windows to the house were closed and locked. The victim did not respond to the doorbell or knocks on any door. The Deziels, looking through a window, noticed that a door to an interior breezeway was uncharacteristically open and that a light shone from the basement stairway. They became concerned because they knew that the victim was in poor health[2] and had a history of falling down. The victim had previously fallen down in various parts of the house, including the basement staircase.

After many unsuccessful attempts to rouse the victim and gain entrance into the house, the Deziels noticed that there were two days of newspapers in the mailbox. At approximately 10 a.m., they went to the Wolcott police station to report their concerns and to request an investigation.

Detective Robert Charette and Lieutenant Don Therkildsen went to the victim's home. The two policemen observed the same conditions as had the Deziel brothers and they also noticed that there were no signs of forced entry. After failing to receive a response to their calls, Charette and Therkildsen forced their way into the house through the kitchen door. Inside, they observed signs that a violent struggle had occurred in the living

---

[2] In fact, the victim usually confined himself to two living room chairs upon which he often slept due to a chronic back problem. He also took many medications in the form of pills for a variety of maladies.

room near the chairs where the victim often slept.[3] Charette ultimately discovered the body of the victim lying at the bottom of the basement stairway. The victim had suffered severe head injuries including a large puncture and fracture of his skull near the left temple. The injuries had been caused by a blunt instrument with a well defined edge that had penetrated and exposed the victim's brain. The victim had also been strangled. Medical evidence indicated that death had occurred sometime between 9:30 a.m. and 9:30 p.m. on Monday, May 14, 1990. The physical evidence found in the house was consistent with the theory that the victim had been strangled in the living room area, dragged to the bottom of the basement staircase and then had been struck with a blunt instrument, in an attempt to give the appearance that he had fallen down the stairs.[4]

The investigation into the death of the victim ultimately focused on the defendant, who was an acquaintance of the victim and a frequent overnight guest at the victim's home. Two weeks prior to his death, the victim had told Charette and Lieutenant Joseph Forte that he feared the defendant, that the defendant was stealing things from him, particularly his medications, and that the defendant acted "crazy" when he drank. Furthermore, on May 15, 1990, an anonymous male person, later determined to be Gerry Deziel, called the Wolcott police station and stated that the defendant had killed the victim.

---

[3] Papers were strewn about the floor, and blood-like stains appeared on a magazine and a piece of pink paper. A metal magazine rack lay crushed on the floor and the telephone had been knocked from its receiver. Also, the officers determined that a standing ashtray had been knocked over and then righted, leaving a deposit of ashes and cigarette butts on the floor which someone had attempted to scoop up and return to the ashtray.

[4] Dr. Henry Lee, the state's chief criminologist, testified that blood spattering near the bottom of the staircase was caused when the victim was struck by an assailant standing over him and wielding a blunt object with a well defined edge.

In the course of the investigation, the police discovered that a black leather wallet containing the victim's credit cards and a faux gold and diamond ring that the victim had always worn on his left hand were missing. Three witnesses saw the defendant wearing the ring on the same day that the victim's body was discovered. The defendant, when asked how he had acquired the ring, gave different accounts concerning its acquisition. Furthermore, the defendant used the victim's otherwise unused VISA credit card to charge purchases on twelve occasions the day of and the day after the murder.

The police also discovered three sneaker prints on the floor of the victim's basement workshop near the victim's body, a creme de menthe bottle with the defendant's fingerprint, placed at the top of the kitchen wastebasket sometime on or after Sunday, May 13, 1990, and a pharmacy receipt with the defendant's name in the victim's bathroom wastebasket. On May 16, 1990, pursuant to a search and seizure warrant, members of the Wolcott police department seized the following items from the defendant's home in Middlebury: the defendant's automobile, two pairs of his sneakers, clothing including a red shirt, and a bottle of valium tablets. The sneakers matched the prints found in the victim's basement, fibers from the red shirt were consistent with fibers found in the carpet under the victim's body, and the valium bottle matched the pharmacy receipt found in the victim's wastebasket.

The defendant gave the police a sworn statement accounting for his whereabouts from Saturday, May 12, to Wednesday, May 16, 1990, and consented to a medical examination. The examination revealed a number of bruises and abrasions on his face, hands, knuckles and knees, some of which were inconsistent with the defendant's claim that he had received the abrasions when he was attacked by two youths on May 15, 1990.

On June 1, 1990, the defendant was arrested and charged with the victim's murder. Other pertinent facts will be discussed as they become relevant to the claims raised by the defendant in this appeal.

I

The defendant first claims that the trial court improperly denied his postverdict motion for judgment of acquittal based upon the insufficiency of the evidence. The defendant makes three related arguments in support of his claim. First, he argues that the evidence failed to connect the defendant with the death of the victim and was therefore insufficient to establish guilt beyond a reasonable doubt. Second, the defendant claims that the evidence presented at trial did not preclude the reasonable hypothesis that a third party had killed the victim, and therefore, that the evidence was insufficient to support a guilty verdict. Finally, the defendant argues that certain postverdict statements of anonymous jurors made to a newspaper reporter indicate that the jury did not apply the correct standard of proof to the evidence. We reject this claim in its entirety.

A

We review a claim of insufficiency of the evidence in accordance with a well established two part test. "We first construe the evidence presented at trial in a manner favorable to sustaining the verdict, and then determine whether the jury could reasonably have found, upon the facts established and the inferences reasonably drawn therefrom, that the cumulative effect of the evidence established guilt beyond a reasonable doubt. *State* v. *Gomez,* 225 Conn. 347, 350, 622 A.2d 1014 (1993); *State* v. *Jarrett,* 218 Conn. 766, 770–71, 591 A.2d 1225 (1991)." *State* v. *Crafts,* 226 Conn. 237, 243, 627 A.2d 877 (1993). The probative force of the evidence is not diminished if it consists of circumstan-

tial, rather than direct, evidence. *State* v. *Moody,* 214 Conn. 616, 625, 573 A.2d 716 (1990).

The critical evidence against the defendant can be summarized as follows. Several witnesses for the state gave testimony from which the jury reasonably could have inferred that the defendant had been at the victim's home at the time of his death. Peter Churchelow, a close friend of the victim, testified that he had had a telephone conversation with the defendant when Churchelow had called the victim's home at approximately 10:30 a.m. on May 14, 1990, in which the defendant had stated that he had been staying at the victim's house since May 12, 1990. During the conversation the defendant agreed to bring the victim to Churchelow's house later that day for a drinking session, but the two never arrived. Churchelow testified at trial that on May 16, after he had read about the victim's death, he had called the defendant and the defendant had explained that he had not driven the victim to Churchelow's home because the victim had been too drunk and that he, the defendant, had subsequently been mugged on a downtown Waterbury street.

Another telephone caller, Douglas Lynch, testified that he had spoken to a person who had identified himself as "Bobo" (the defendant's street name) at 11:15 a.m. on May 14. Lynch had been trying to locate his friend, Richard Deziel, whom Lynch believed to have been staying at the victim's home. Lynch, who knew the victim well, testified that, during the course of a disjointed conversation with the defendant, he neither had spoken to the victim nor had heard the victim's voice in the background, even during a period of silence when the defendant had left the phone.[5] Furthermore, Lynch testified that he frequently called the victim's home and the victim always had answered the phone himself.

[5] Lynch described the victim as a loud voiced man.

The testimony of Dawn Zembruzski, the victim's neighbor, also placed the defendant at the victim's home on May 14, 1990. She testified that, on that day, she had observed a vehicle similar to the defendant's light blue Plymouth parked behind that of the victim. She had observed this vehicle between 2:30 and 10 p.m. on four separate occasions as she had left and returned to her own home.[6]

Perhaps the most damaging evidence against the defendant was his possession and use of the victim's missing VISA credit card for purchases on twelve occasions on the day of and the day after the victim's death, during what can best be described as a shopping spree.[7] Sales receipts from the purchases were admitted into evidence and three store clerks identified the defendant as the person who had used the victim's VISA credit card and had signed the victim's name in their respective stores. Furthermore, Santos Machado, who had accompanied the defendant and had driven him during his shopping spree, testified that he had witnessed the defendant make many of the purchases and that he had seen a receipt with the victim's name on the charge slip. Richard Deziel testified that, as a longtime friend of the victim, he was acquainted with the victim's habits regarding his credit cards and that the victim had never lent his credit cards to anyone.

Further evidence supporting a finding of the defendant's guilt was the victim's missing faux gold and dia-

---

[6] The times she observed the vehicle were 2:30 p.m., 3:15 p.m., 5:30 p.m., and 10 p.m. In contrast to the witnesses' testimony placing the defendant at the victim's home, the jury had before it the defendant's sworn statement to the police regarding his whereabouts on May 14, 1990. This statement was replete with conflicting dates and times and factual nonsequiturs. The jury could have easily rejected the defendant's statement outright and have concluded that the evidence placing him at the victim's home on the day of the murder was more credible.

[7] Another witness testified that the defendant had approached him on May 15, 1990, and had offered to sell, for one half of its value, a radio that the defendant had purchased earlier that day with the victim's credit card.

mond ring that the defendant had been seen wearing the day after the murder.[8] Machado testified that the defendant had told him that an uncle had given the ring to him as a birthday gift. Two other witnesses, Adam Alvarado and Ramone Rosado, testified that the defendant had claimed that he had purchased the ring for $10 in a bar. The day after the murder, the defendant brought the ring to a jewelry store to be appraised.

Furthermore, the jury heard evidence that contradicted the defendant's claim that the cuts, bruises and abrasions on his face, hands, knuckles and knees were the result of a mugging by two youths on a downtown Waterbury street.[9] Sonia Gomez, a state's witness, testified that she had observed the mugging from her third floor apartment on Baldwin Street in Waterbury. She stated that, although two boys had pushed the defendant to the ground and had kicked him, there had been no actual fight and the boys had run off when she had shouted at them. Gomez testified that the defendant's head had hit the pavement resulting in a bloody cheek and forehead, and that she had gotten a towel from her daughter and had applied it to the defendant's wounded head. Moreover, Joseph Brenes, a physician who conducted a medical examination of the defendant on May 16, 1990, opined that several of the defendant's injuries were too old to have been caused by the Baldwin Street incident or were inconsistent with the defendant's version of the incident.[10]

Finally, the physical evidence gathered during the investigation indicated that the defendant had been in

---

[8] This ring was never located.

[9] In support of this explanation for the defendant's injuries, Machado testified that he had witnessed the attack on the defendant on May 15 between 3:15 and 3:30 p.m. and that the defendant had received cuts on his face from which he was bleeding. Also, Rosado, a Baldwin Street storekeeper, testified that he had seen the defendant on May 14, 1990, and had observed no cuts or marks on him at that time, but that he had observed injuries to the defendant's face on May 15, 1990, at approximately 5:30 p.m.

[10] Brenes had been called as a witness for the defense.

the victim's home as late as May 13, 1990, the day before the murder. Also, sneaker prints found near the victim's body matched the sneakers located during the search of the defendant's home and red shirt fibers discovered on the carpet under the victim's body matched characteristics of red fibers taken from the defendant's shirt.

The defendant argues that, from the totality of the evidence presented at trial, the jury could not have concluded beyond a reasonable doubt that the defendant had killed the victim. The defendant suggests that the physical evidence failed to connect the defendant to the crime because the fibers, sneaker prints and fingerprints could have resulted from the defendant's activity in the house, where admittedly he had been a house guest. The defendant also argues that the presence of the faux diamond and gold ring and the use of the victim's VISA credit card do not indicate anything more than that the defendant had taken these items from the victim's home where he had easy access to them.

While much of the state's case rested upon circumstantial evidence, we cannot say that the evidence was insufficient for the jury to have found the defendant's guilt proven beyond a reasonable doubt. In so concluding, we note that " '[t]here is no legal distinction between direct and circumstantial evidence so far as probative force is concerned.' " *State* v. *Brown,* 168 Conn. 610, 618, 362 A.2d 910 (1975). "[I]t is not one fact, but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence." (Internal quotation marks omitted.) *State* v. *Crafts,* supra, 245.

"[I]n viewing evidence which could yield contrary inferences, the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence.

The rule is that the jury's function is to draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Grant,* 219 Conn. 596, 604, 594 A.2d 459 (1991). "If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Adams,* 225 Conn. 270, 277, 623 A.2d 42 (1993).

In light of the factual evidence and the inferences that could reasonably be drawn therefrom, we conclude that the jury could have determined that the state had established the defendant's guilt beyond a reasonable doubt. See *State* v. *Baldwin,* 224 Conn. 347, 368, 618 A.2d 513 (1993). The jury could reasonably have inferred from the evidence that the defendant had been present in the victim's home on the day of the murder, that the abrasions discovered on his body were the result of a struggle that he had with the victim, that he had taken the victim's body to the basement and placed it so as to make it appear that the victim had fallen down the stairs, and that he had taken the victim's ring and credit card and had used them without concern for whether his fraudulent use would be discovered by the victim. Accordingly, we conclude that the trial court properly rejected the defendant's motion for judgment of acquittal based on the insufficiency of the evidence.

## B

The defendant also contends that the evidence he had presented at trial that a third party had killed the vic-

tim was sufficient to preclude the jury's finding that he was guilty of murder beyond a reasonable doubt. We disagree.

It is well established that a defendant has a right to introduce evidence that another person committed the offense with which the defendant is charged. *State* v. *Hernandez,* 224 Conn. 196, 202, 618 A.2d 494 (1992). Third party suspect evidence is admissible if it directly connects the third party to the crime. *State* v. *Echols,* 203 Conn. 385, 392, 524 A.2d 1143 (1987). "It is not enough [however] to show that another had the motive to commit the crime . . . nor is it enough to raise a bare suspicion that some other person may have committed the crime of which the defendant is accused." (Citations omitted; internal quotation marks omitted.) *State* v. *Hernandez,* supra.

At trial, the defendant admitted evidence to support his theory that a third party, either Gerry Deziel or Richard Deziel or both, had killed the victim. This evidence tended to show the following: (1) that Gerry Deziel had known the victim well and had known that the victim kept large amounts of money in his house; (2) that Gerry Deziel had talked about killing the victim in the past; (3) that the Deziel brothers had planned to visit the victim on the day of the murder between noon and 1 p.m.; and (4) that two weeks after the defendant's trial had begun, Gerry Deziel had made incriminating statements concerning his involvement in the victim's death in front of three witnesses.[11]

Each of the witnesses who testified in support of this theory was impeached with evidence of an unfriendly relationship with Gerry Deziel and/or with prior con-

---

[11] The three witnesses introduced by the defendant at trial were Mary Beth Fleming, Timothy Potter, Fleming's boyfriend, and Gary Pesce. Each witness testified that they had been together in a bar and that there they had heard Gerry Deziel say, in reference to the murder, that it was his own business if he had killed the victim.

victions. Also, the jury could have considered the testimony of the Deziel brothers that they were close friends of the victim. Richard Deziel testified that he had given the victim as a gift the missing faux gold and diamond ring that was later seen on the defendant. Moreover, no physical evidence linked either Gerry or Richard Deziel to the scene of the crime.

The defendant nonetheless contends that, because the evidence at trial did not preclude the hypothesis that either Gerry or Richard Deziel had killed the victim, the state's evidence was insufficient to permit a finding of his guilt beyond a reasonable doubt. We disagree.

Once the evidence of third party guilt was before the jury, it was the jury's duty to weigh that evidence, to view the demeanor of the witnesses, and to assess their credibility. *State* v. *Baldwin,* supra, 367–68. Ultimately, it was up to the trier of fact to determine whether the evidence of third party guilt was such that it precluded a finding of the defendant's guilt. A jury may, when assessing evidence that could yield contrary inferences, draw those inferences consistent with guilt, and is not required to draw only those inferences consistent with innocence. *State* v. *Adams,* supra, 281. "When conflicting explanations are presented, the trier is entitled to reject, as less credible, testimony and inferences offered on behalf of the defendant." Id. The trier may even reject uncontradicted testimony if it finds that it is not credible, and this court cannot on appeal retry the case or pass upon the credibility of witnesses. *State* v. *Baldwin,* supra.

The relevant inquiry is not whether the jury correctly evaluated the credibility of the various witnesses presented at trial, but whether there was sufficient evidence to support the defendant's conviction. We have already determined that there was sufficient evidence. Therefore, the defendant's argument is without merit

and the trial court properly rejected this claim in denying the defendant's postverdict motion for judgment of acquittal.

## C

The final part to the defendant's first claim also has no merit. The essence of his claim is that the jury applied an inappropriate standard of proof in convicting him, and, consequently, when this fact was revealed, the trial court improperly denied him a judgment of acquittal. The facts pertinent to this claim are as follows. At his sentencing, the defendant, in support of his motion for judgment of acquittal, offered a newspaper article and his personal representation that a juror had told a newspaper reporter that the jury had convicted the defendant because "[after] putting [the evidence] together as pieces of a puzzle . . . the evidence pointed more towards [the defendant] than it did towards [Gerry] Deziel." Finding this record inadequate, the trial court rejected the defendant's claim and denied his postverdict motion for judgment of acquittal. The defendant claims that this evidence indicates that the jury did not follow the court's instructions as to the state's burden of proving the defendant's guilt beyond a reasonable doubt. We agree with the trial court that this claim must fail because the defendant has failed to provide an adequate record for review.

Jurors are presumed to have followed the instructions of the court as to the law in the absence of a clear indication to the contrary. *State* v. *Negron,* 221 Conn. 315, 331, 603 A.2d 1138 (1992). To challenge the conduct of the jury, the appellant bears the burden of furnishing a record adequate to review a claimed error. *State* v. *Laracuente,* 205 Conn. 515, 520, 534 A.2d 882 (1987), cert. denied, 485 U.S. 1036, 108 S. Ct. 1598, 99 L. Ed. 2d 913 (1988). A criminal conviction cannot be reversed

on appeal on the basis of a newspaper article recounting a juror's informal statement concerning the jury's deliberative process, buttressed only by an affirmation by the juror's attorney attesting to the accuracy of the juror's statement. The newspaper article alone does not constitute a reviewable appellate record, and it is well settled that statements of counsel are not evidence. *State* v. *Roman,* 224 Conn. 63, 68, 616 A.2d 266, cert. denied, U.S. , 113 S. Ct. 1868, 123 L. Ed. 2d 488 (1992); *State* v. *Tillman,* 220 Conn. 487, 496, 600 A.2d 738 (1991), cert. denied, U.S. , 112 S. Ct. 3000, 120 L. Ed. 2d 876 (1992).

Here, the defendant eschewed the opportunity to provide an adequate record for review of his claim. He neither requested a postverdict voir dire of the individual jurors nor requested a full evidentiary hearing regarding possible external influences on the jury's deliberations. Furthermore, he did not subpoena the individual jurors for examination by the trial court. Without resort to these and other avenues of inquiry, he has made it impossible for us to determine, now, whether the jury employed an inappropriate legal standard to convict the defendant. " 'Our role in a case like this . . . is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . .' " *State* v. *Tirado,* 194 Conn. 89, 92–93, 478 A.2d 606 (1984). Considering the record at hand, we cannot address this claim further.

## II

The defendant next claims that the trial court improperly denied his motion in limine to exclude evidence of sneaker prints, a fingerprint, a pharmacy receipt and red shirt fibers. He argues that this evidence, admitted over his objections, "failed to show a relationship beyond a reasonable doubt between [it] and the death of the victim." We read this claim to rest on the issue

of relevancy of the evidence. We disagree with the defendant's argument that the trial court improperly concluded that the evidence was relevant and improperly failed to instruct the jury to disregard this evidence.

At the beginning of the trial, the defendant filed an unsuccessful motion in limine to preclude the admission of the evidence of the sneaker prints, a fingerprint and red shirt fibers.[12] The defendant argued that this evidence was more prejudicial than probative because, since the state could not pinpoint the time when this evidence was produced, its admission would lead to speculation and conjecture on the part of the jury. During the trial, on grounds similar to those expressed in the motion in limine, the defendant also unsuccessfully objected to the state's offer of a pharmacy receipt, made out in the defendant's name and dated May 13, 1990, that the police had found in the victim's wastebasket on May 15, 1990.

At the conclusion of the state's case-in-chief, and again at the conclusion of the evidentiary phase of the trial, the defendant moved to strike the evidence of the sneaker prints, fingerprint, shirt fibers and the pharmacy receipt. Finally, the defendant requested that the trial court instruct the jury to disregard this evidence on the grounds that it did not connect the defendant to the death of the victim and therefore had no probative value. The trial court denied the defendant's requests and instructed the jurors that it was their duty to determine whether and how the physical evidence fit together with the other circumstantial evidence and whether it was probative of the crime charged.[13]

[12] The defendant's motion in limine also included other items such as the victim's faux gold and diamond ring, gun and credit cards. The defendant presently challenges the denial of this motion with respect to only the sneaker prints, a fingerprint, the pharmacy receipt and certain red shirt fibers.

[13] The trial court instructed the jury on this point as follows: "And I would just also at this particular juncture point out, which has been pointed out

The defendant argues that the trial court improperly admitted the challenged physical evidence. The defendant seems to argue that, because there were explanations for the presence of this evidence that did not necessarily implicate the defendant in the victim's death, and because these other explanations were not completely ruled out, the evidence was not probative of the defendant's involvement in the crime and was therefore irrelevant.

Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. *State* v. *Jeffrey,* 220 Conn. 698, 704, 601 A.2d 993 (1991), cert. denied, U.S. , 112 S. Ct. 3041, 120 L. Ed. 2d 909 (1992). "We have also held that 'evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree.' *State* v. *Rinaldi,* 220 Conn. 345, 353, 599 A.2d 1 (1991); *State* v. *Jeffrey,* supra, 706." *State* v. *Marra,* 222 Conn. 506, 521, 610 A.2d 1113 (1992).

"[T]he fact that evidence is susceptible of different explanations or would support various inferences does

in argument as to certain facts that have been—obviously it's easy for you to believe, but I'm just making reference to them right now: The State has claimed that it's proved that there was a fingerprint of the defendant on a creme de menthe bottle; also that there were footprints found in the basement and two of the footprints they claim were from the defendant's sneaker and one came from a sneaker like the defendant's. And the third one, obviously, was the pharmacy receipt that was found in the wastepaper basket. Again, these are all what the claims of the State are.

"So, all of these things are put together for you to determine how they fit in. And it has been pointed out by counsel there's no way of the dates of the footprints, but it's up to you to determine whether or not with all of the evidence together whether these things can be tied in date-wise and time-wise to the event. So that's what this circumstantial evidence is all about. If you come to the conclusion that the State hasn't done that, then you would disregard that particular piece of evidence or sequences of evidence. But, again, it's for you to consider all of the testimony, all of the exhibits and consider whether or not they all fit together as I've charged you on the definition of circumstantial evidence. Okay?"

not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Joly,* 219 Conn. 234, 252, 593 A.2d 96 (1991). The trial court has broad discretion to determine the relevancy of evidence, and we will not disturb a trial court's ruling on the admissibility of evidence in the absence of a clear abuse of discretion. *State* v. *Holliman,* 214 Conn. 38, 50, 570 A.2d 680 (1990).

The physical evidence was probative on the issue of whether the defendant had been with the victim at his house during the period of time when the murder occurred. Accordingly, this evidence was relevant to whether the defendant had an opportunity to commit the crime with which he was charged. Also, the weakness of the inculpatory inferences to be drawn from this physical evidence was elicited by the defendant during cross-examination of the state's witnesses and was emphasized again during the defendant's final argument.

Although conflicting interpretations might reasonably have been given to the presence of the evidence, the trier of fact bears the responsibility for assessing and reconciling such inconsistencies. We conclude that the trial court properly admitted the challenged evidence as relevant, and that it properly instructed the jury as to the consideration to be given it.

## III

The defendant's third claim is that the trial court improperly precluded the defendant from introducing evidence of four prior felony convictions to impeach a state's witness, Gerry Deziel. The defendant contends that this error implicated the defendant's constitutional

right to confront witnesses and that it requires a new trial. We disagree.

At the conclusion of the direct examination of Gerry Deziel, and outside the presence of the jury, the state disclosed to the court and to the defendant that the witness had been convicted of the following crimes: four counts of breaking and entering in 1957; two counts of breaking and entering and two counts of larceny in 1958; one count of breaking and entering theft in 1959; and one count of larceny in the third degree in 1989. The defendant sought to use all of these convictions to impeach Gerry Deziel. The trial court concluded that the 1989 felony conviction was admissible to impeach the witness, but that the earlier convictions were too remote in time to have any probative value.

The defendant elected, for strategic purposes, not to introduce a certified copy of the 1989 conviction on cross-examination of Gerry Deziel. Near the close of the defense case, however, the defendant attempted to introduce a certified copy of the 1989 conviction. The trial court ruled that the conviction could not come into evidence at that time, and that it should have been offered during cross-examination of the witness.

There are three components to the defendant's argument on appeal. First, he argues that the trial court improperly excluded the 1957, 1958 and 1959 convictions as being too remote. Next, the defendant argues that the trial court improperly precluded him from introducing the 1989 conviction at the end of the defense case rather than during cross-examination of Gerry Deziel. Finally, the defendant argues that the exclusion of all of these convictions implicated his constitutional right to confront witnesses and therefore that the trial court committed reversible error. We address these claims seriatim.

## A

The credibility of a witness may be attacked by introducing the witness' conviction of a crime if the maximum penalty for that conviction is imprisonment exceeding one year. See General Statutes § 52-145 (b); *State* v. *Braswell,* 194 Conn. 297, 307, 481 A.2d 413 (1984), cert. denied, 469 U.S. 1112, 105 S. Ct. 793, 83 L. Ed. 2d 786 (1985). A trial court's decision to allow the use of a prior conviction for impeachment purposes will not be disturbed unless the court abused its discretion. *State* v. *Braswell,* supra.

"Three factors have usually been identified as of primary importance in considering whether a former criminal conviction is to be admitted: (1) the extent of the prejudice likely to arise; (2) the significance of the commission of the particular crime in indicating untruthfulness; and (3) its remoteness in time." *State* v. *Nardini,* 187 Conn. 513, 522, 447 A.2d 396 (1982). The determination of remoteness is left to the sound discretion of the trial court. Id., 526; C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 7.21.5, p. 197.

While leaving the matter to the general discretion of the trial court, we have sanctioned a general guideline for the determination of remoteness that parallels rule 609 (b) of the Federal Rules of Evidence.[14] Rule

---

[14] Federal Rules of Evidence 609 (b) provides in pertinent part: "Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect."

We have acknowledged that this federal standard is not our own, but rather serves "as a rough bench mark in deciding whether trial court discretion has been abused . . . ." *State* v. *Nardini,* 187 Conn. 513, 526, 447 A.2d 396 (1982).

609 (b) establishes a ten year limitation from conviction or release from resulting confinement upon the use of the conviction for impeachment purposes unless the probative value of the conviction substantially outweighs its prejudicial effect. *State* v. *Nardini,* supra, 525–26. Although we recognize that convictions having special significance on the issue of veracity may surmount the standard ten year bar; id., 526; we conclude that, in this case, it was within the trial court's discretion to conclude that three convictions more than thirty years old, even though bearing on the witness' veracity, were too remote to be admissible.

"The probative value of a conviction in determining the credibility of a witness is related to the span of time between the conviction and the proffered testimony." *State* v. *Roman,* 6 Conn. App. 189, 191, 504 A.2d 529 (1986). We conclude that the trial court did not abuse its discretion when it ruled that the 1957, 1958 and 1959 convictions were not sufficiently probative, and therefore were inadmissible to impeach Gerry Deziel.

B

The defendant also argues that the trial court abused its discretion by refusing to admit into evidence a certified copy of Gerry Deziel's 1989 felony conviction as untimely after it had earlier ruled that the 1989 conviction was admissible. In opposing the offer of the certified copy of the conviction at trial, the state argued, and the trial court agreed, that the offer was untimely because the introduction of the document at the close of the defense case would have denied the state the opportunity to rehabilitate its witness.[15] The defend-

---

[15] The state also argued that the certified copy of the conviction contained extraneous, prejudicial information that should not be viewed by the jury. The trial court's decision, however, was based solely on the question of the timeliness of the offer. The court reasoned that the document should have been offered during the cross-examination of Gerry Deziel. The state's argument regarding the alleged prejudicial contents of the document is therefore not in issue here.

ant argues on appeal that there is no limitation in our Connecticut practice as to when he could introduce the conviction, and that the trial court abused its discretion in disallowing it. We agree.

"Prior convictions, when offered to impeach credibility through the inference of general bad character, may be proved either by questioning the witness or by introduction of a certified copy of the judgment reflecting the conviction." *State* v. *Denby,* 198 Conn. 23, 29–30, 501 A.2d 1206 (1985), cert. denied, 475 U.S. 1097, 106 S. Ct. 1497, 89 L. Ed. 2d 898 (1986); see also *State* v. *English,* 132 Conn. 573, 581–82, 46 A.2d 121 (1946); C. Tait & J. LaPlante, supra, § 7.21.3, pp. 195–96. We have yet to determine, however, the precise time when such an offer of this type of evidence should be made.

As a prefatory matter, we note that the federal rule governing impeachment by proof of convictions limits the offer of such evidence to the cross-examination of the witness.[16] We have no similar rule in Connecticut, and we decline to establish one today. The defendant's right to confront the witnesses against him includes the right to impeach the credibility of those witnesses through prior convictions. See *State* v. *Rodriguez,* 180 Conn. 382, 393–94, 429 A.2d 919 (1980). We see no reason to burden that right by limiting the offer of copies of criminal convictions to the time of cross-examination.

The state's argument that it would have been prejudiced by the admission of the documentary evidence

[16] Federal Rules of Evidence 609 (a) provides: "For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted *if elicited from the witness or established by public record during cross-examination* but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant, or (2) involved dishonesty or false statement, regardless of the punishment." (Emphasis added.)

of the conviction at the end of the defense case is unpersuasive. The state had the opportunity to make the jury aware of the conviction during Gerry Deziel's direct examination. Furthermore, our rules of criminal procedure would not have precluded the state from requesting further rebuttal to rehabilitate Deziel or prohibited the trial court from exercising its discretion to grant such a request. Practice Book § 874, which establishes the order of procedure in a criminal trial, provides in subsection (3) that "[t]he prosecuting authority and the defendant may present rebuttal evidence in successive rebuttals, as required" unless the trial court "for cause" permits otherwise. See *State* v. *Addazio,* 169 Conn. 416, 427, 363 A.2d 153 (1975). The state is allowed to rehabilitate a witness whose credibility has been impeached by a prior conviction by allowing that witness to explain the circumstances underlying the prior conviction; see *State* v. *Morgan,* 179 Conn. 617, 621, 427 A.2d 429 (1980); and may rebut such evidence by other evidence. See *Smirnoff* v. *McNerney,* 112 Conn. 421, 423, 152 A.2d 399 (1930); see also A. Spinella, Connecticut Criminal Procedure (1985) p. 700.

Given the opportunities it would have had to rehabilitate the witness, we fail to understand how, under the circumstances of this case, the state would have been prejudiced by the introduction of the certified copy of Gerry Deziel's 1989 felony conviction at the conclusion of the direct examination of the defense's last witness. The state had notice that Deziel was subject to impeachment by the 1989 conviction by virtue of the trial court's preliminary ruling on the matter. The state could either have presented the conviction anticipatorily on direct examination of Deziel, or could have requested that rebuttal witnesses be called once the conviction had been entered into evidence by the defendant.

Considering the importance of preserving the defendant's right to impeach witnesses against him, we con-

clude that the trial court abused its discretion by exclud-
ing the defendant's offer of the certified copy of Gerry
Deziel's 1989 felony conviction.[17]

## C

Our inquiry does not end there, however, for we now
consider whether the trial court's preclusion of the evi-
dence of the 1989 conviction requires a new trial. The
burden of proving the harmfulness of the error depends
upon whether the error is merely evidentiary or is of
constitutional magnitude. Where evidentiary error is
claimed, the defendant bears the burden of proving the
harmfulness of the error before a new trial will be
granted. Where the claimed error is one of constitu-
tional magnitude, however, the state must prove that
the error is harmless beyond a reasonable doubt. *State*
v. *Torres,* 210 Conn. 631, 642–43, 556 A.2d 1013 (1989).

The defendant contends that the trial court's eviden-
tiary rulings regarding *all* of the convictions implicate
his constitutional right to confront witnesses under the
sixth amendment to the United States constitution and
article first, § 8, of the Connecticut constitution.[18] In
view of our conclusion that the trial court properly
excluded the earlier three convictions, we consider the
defendant's constitutional claim only with respect to
the exclusion of the 1989 conviction.

We note that the defendant did not claim at trial that
the exclusion of the 1989 conviction violated his con-
stitutional right to confront and cross-examine the wit-

[17] Our review of the record reveals nothing unusual in the course of this
trial that would otherwise account for the trial court's exercise of its dis-
cretion in the manner that we have found to be improper. The trial court's
reasoning that the offer of the certified copy was untimely rested on the
court's sole belief that the defendant should have offered the document dur-
ing Gerry Deziel's cross-examination.

[18] Because the defendant provides no separate analysis for his state con-
stitutional claim, we do not address it. See *State* v. *Mercer,* 208 Conn. 52,
67 n.9, 544 A.2d 611 (1988).

nesses against him. Therefore, this claim is reviewable only under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989).[19] We conclude that, even if the trial court's exclusion of the 1989 conviction was an error of constitutional magnitude, the defendant cannot prevail on this claim. Under the fourth prong of *Golding*, the state has demonstrated that the error was harmless beyond a reasonable doubt because the defendant had ample opportunity to impeach the credibility of Gerry Deziel. See footnote 19.

Gerry Deziel testified at trial that he had not gone to the victim's home on May 14, 1990, the day the murder occurred. He stated that he and his brother had gone to see the defendant on May 15, 1990, and that, having been unable to get an answer at the door, they had contacted the Wolcott police to investigate. Deziel also testified that, later that day, he had called the police and told them that the defendant had killed the victim.

During the defense case, testimony was presented that Gerry Deziel had bragged in front of three witnesses that he had killed the victim but that it was nobody's business. Evidence was also presented that Deziel had talked before about killing the victim, and that he had known that the victim kept large amounts of money in his house. Furthermore, to contradict Deziel's testimony that he had not visited the victim on May 14, 1990, testimony was presented that Deziel had told a friend that he and his brother were going to see the victim that day.

---

[19] In *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), we held that a defendant can prevail on an unpreserved claim if only *"all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.)

The defendant argues that the 1989 conviction would have impeached Gerry Deziel's testimony that he had not gone to the victim's home on May 14, and could have therefore reasonably affected the verdict. Throughout the trial, the defendant took full opportunity to impeach the credibility of Deziel notwithstanding the exclusion of his prior criminal conviction. On cross-examination, Deziel himself admitted that the victim had accused him many times of stealing from him, although Deziel had previously described the victim as a close friend.

The defendant also impeached Deziel's credibility with the testimony of Mary Beth Fleming. Fleming testified that, notwithstanding Deziel's assertion of friendship and close relationship with the victim, she had heard Deziel express hatred for the victim and make statements suggesting that he was involved in his death.[20] Another defense witness, Gary Pesce, had corroborated that testimony. Furthermore, the testimony of Duke Halit, that Deziel had said he was on his way to see the victim on the afternoon of May 14, 1990, contradicted Deziel's testimony that he had not gone to the victim's house until May 15.

Also, the testimony of the witnesses for the defense vividly painted a picture of Gerry Deziel as an individual who was not a paragon of virtue. Witnesses Fleming, Pesce and Timothy Potter testified that Deziel was

---

[20] The defendant's counsel himself stated to the court that Fleming's testimony impeached Gerry Deziel. In an argument to the court concerning Fleming's testimony, the defendant's counsel stated: "As far as number one, the statements two years ago, Your Honor, I'm offering those as being contradictory. Mr. Deziel has testified here, it's being contradictory to his position that he was always good friends with Joe; that he never hated Joe; that Joe sometimes would get mad at him when he was drunk, but they always had a good relationship. And this indicates that he had a bad animus towards Mr. Sylvestro at that time as to the—It may not be relevant to this, except it is relevant to his testimony because Mr. Deziel—to impeach Mr. Deziel. . . ."

a drunken, vulgar, bad tempered man who did not repay his debts. In addition, Fleming told the jury that Deziel had raped her in 1989, and that on June 3, 1991, he had threatened her if she told anyone about the rape.

We are persuaded that the cumulative effect of the testimony of these defense witnesses effectively impeached Gerry Deziel's credibility and veracity to the same or similar extent as it would have been impeached by the addition of the excluded 1989 felony conviction. It is also significant to note that, while the defendant may have relied heavily on the jury's acceptance of Deziel as a suspect in the crime, Deziel was not the state's key witness against the defendant. Even without the testimony of Deziel, the state produced a case sufficient to sustain its burden of proving the defendant's guilt beyond a reasonable doubt.

Therefore, we conclude that the admission of the 1989 conviction would not have tended to influence the judgment of the jury and therefore, under the fourth prong of *Golding*, the claimed error is harmless beyond a reasonable doubt.

Our disposition of the defendant's constitutional claim necessarily determines that the claimed improper evidentiary ruling does not warrant a reversal of the judgment and a new trial. In the case of evidentiary error, the defendant bears the burden of proving harm. *State* v. *Torres,* supra, 642. "The defendant must show that it is more probable than not that the erroneous action of the court affected the result." (Internal quotation marks omitted.) *State* v. *Payne,* 219 Conn. 93, 103–104, 591 A.2d 1246 (1991). We have already determined, however, that even if the failure of the trial court to admit the 1989 conviction is assumed to be of constitutional magnitude, it did not " 'have a tendency to . . . influence the judgment of the jury' "; *State* v. *Santiago,* 224 Conn. 325, 333, 618 A.2d 32 (1992); and was therefore harmless.

We conclude, therefore, for the reasons set forth above, that the defendant has failed to demonstrate the harmfulness of the court's exclusion of the 1989 conviction.

## IV

The defendant's final claim requires little discussion. He seeks review of the sufficiency of the evidence at the probable cause hearing to support the finding of probable cause against him. At oral argument, however, the defendant's counsel conceded that his failure to prevail on his first claim would preclude his success on this one as well, since the evidence presented against the defendant at the probable cause hearing was substantially the same as that presented at trial. We therefore conclude that the trial court's finding of probable cause was adequately supported by the evidence presented at the hearing.

The judgment is affirmed.

In this opinion the other justices concurred.