STATE OF CONNECTICUT *v.* ROBERT ARBOUR
(9928)

FOTI, LAVERY and LANDAU, Js.

Argued October 28—decision released December 22, 1992

*Bruce A. Sturman,* public defender, with whom, on the brief, was *Peter Scillieri,* assistant public defender, for the appellant (defendant).

*Susann E. Gill,* assistant state's attorney, with whom, on the brief, were *John Bailey,* state's attorney, and *Christopher L. Morano,* assistant state's attorney, for the appellee (state).

LANDAU, J. The defendant appeals from a judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1).[1] On appeal, the defendant claims that the trial court improperly (1) denied him his rights under the sixth amendment to the United States constitution, and (2) prohibited him from raising a theory of diminished capacity. The defendant further claims that the trial court abused its discretion by (1) excluding expert testimony on behalf of the defendant on the issue of intent, (2) refusing to instruct the jury on the theory of diminished capacity, and (3) limiting the scope of the defendant's summation as to diminished capacity. We agree with the defendant's claim that the trial court abused its discretion when it excluded expert testimony on the issue of intent. This being dispositive of the appeal, we need not reach the defendant's other claims.

The jury could reasonably have found the following facts. On December 13, 1989, the defendant resided with his spouse, daughter, and parents in Newington. At approximately 7 p.m. on that date, while the defendant's brother, Roger Arbour, was visiting at the house, an argument ensued among members of the family. When the defendant and Roger began quarreling, their father attempted to quiet them. The defendant's mother also attempted to intervene and was struck by

---

[1] General Statutes § 53a-59 provides in pertinent part: "ASSAULT IN THE FIRST DEGREE: CLASS B FELONY. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

her husband. Roger struck his father, breaking three of his ribs. Roger then chased the defendant through the house. The defendant attempted to open the front door but could not. His mother pushed Roger away from the defendant and told the defendant to go upstairs.

While the defendant was upstairs, his wife told Roger to leave. Roger grabbed her, letting her go only on his mother's command. The defendant, returning to the kitchen with a rifle that he obtained from an upstairs bedroom, shot Roger in the back of the head. Roger was hospitalized for approximately seven months, during which time he twice underwent major surgery. He suffered damage to the right side of his brain and optic nerve and he is legally blind and permanently without sensation on the left side of his body.

When the police officers responded to the report of the domestic disturbance, they were admitted to the premises by the defendant, who had what appeared to be a laceration on his forehead and blood on his face. The victim lay on the floor in a pool of blood. The defendant told the police that his wife had shot his brother, that his brother had been on drugs and had stabbed him with a knife, that his brother had hit him with the butt of a rifle, and that when he had intervened in a fight between his father and the victim he had been hit on the head and rendered unconscious.

At trial, witnesses testified that at the time of the incident the defendant appeared dazed, unresponsive, incoherent, glassy eyed, and unable to focus his eyes or attention. There was also evidence that the defendant initially looked calm and alert. The defendant testified that he did not intentionally shoot his brother.

The state offered testimony from Edward J. Fredericks, a neurologist, concerning the injuries suffered by the defendant. Fredericks was asked about incoherence

as a result of the defendant's injuries and whether incoherence would be expected immediately after receiving the injury or would be somewhat delayed. The doctor stated that he expected it to be "right from the beginning of the injury."

Peter Sereny, an internist, testified for the defendant that one portion of the defendant's medical records indicated that the defendant lost consciousness the night of the shooting, although another portion of the records indicated that he suffered a head injury without loss of consciousness. He also testified that the defendant suffered a laceration over his left eyebrow, a blunt head injury and a concussion. Sereny was then asked whether he had an opinion about the defendant's ability to form a rational intent at about 7:30 p.m. on the evening of the shooting, after the defendant had received the injury. The state objected and the court sustained the objection, citing Practice Book §§ 759 and 761. The trial court held that the defendant's failure to provide notice of his intention to rely on expert testimony to establish a mental disease or defect negating intent precluded Sereny's opinion testimony. The defendant countered that the state had "opened the door" to Sereny's opinion evidence by asking Fredericks about the effect of the defendant's injuries on the defendant's mental process, and, therefore, §§ 759 and 761 were not applicable. On appeal, the defendant claims that the failure to allow Sereny's opinion testimony was an abuse of discretion. We agree.

The decision to preclude a party from introducing expert testimony is within the discretion of the trial court. *Yale University School of Medicine* v. *McCarthy,* 26 Conn. App. 497, 500–501, 602 A.2d 1040 (1992); *Sturdivant* v. *Yale-New Haven Hospital,* 2 Conn. App. 103, 106–107, 476 A.2d 1074 (1984). On appeal, that decision is subject only to the test of abuse of discretion. *Yale University School of Medicine* v. *McCarthy,*

supra, 501; *Kemp* v. *Ellington Purchasing Corporation,* 9 Conn. App. 400, 405, 519 A.2d 95 (1986). "Discretion means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *State* v. *Polanco,* 26 Conn. App. 33, 41, 597 A.2d 830 (1991). The salient inquiry is whether the court could have reasonably concluded as it did. *Yale University School of Medicine* v. *McCarthy,* supra. " 'It goes without saying that the term "abuse of discretion" does not imply a bad motive or wrong purpose but merely means that the ruling appears to have been made on untenable grounds.' " *State* v. *Schroff,* 198 Conn. 405, 413, 503 A.2d 167 (1986). " 'In determining whether there has been an abuse of discretion, much depends upon the circumstances of each case.' " Id.

Practice Book § 759 provides that a defendant who intends to "introduce expert testimony relating to a mental disease or defect . . . shall . . . notify the prosecuting authority in writing of such intention . . . ." Practice Book § 761 provides "as the only sanction for noncompliance with § 759 that the court 'may exclude the testimony of any expert witness offered by the defendant on the issue of his mental state.' " *State* v. *Hines,* 187 Conn. 199, 205, 445 A.2d 314 (1982). After the defendant attempted to elicit testimony from Sereny regarding the defendant's state of mind at the time of the incident, the state objected, and the court stated: "If the question purports to seek from this doctor a medical opinion as to the defendant's state of mind at the time of the alleged incident, and in view of failure to comply with Practice Book §§ 759 and 761, the court must sustain the objection."

The trial court seems to have understood the sanctions of Practice Book § 761 to be mandatory, but that is not true. We have long held that "[f]ailure to com-

ply with the notice requirement [of § 759] does not per se justify a refusal to give an instruction on mental condition." *State* v. *Burge,* 195 Conn. 232, 239, 487 A.2d 532 (1985). Nor does such failure on the part of the defendant mandate that Sereny be prevented from testifying as to the defendant's mental condition at the time of the assault. While we are cognizant that rules promulgating discovery and requiring notice promote a legitimate and important judicial interest, these rules can clash, as they do here, with a defendant's sixth amendment right to present a defense. The right to present a defense is embodied in the right to compulsory process and is applied to state prosecutions through the due process clause of the fourteenth amendment to the United States constitution. *Washington* v. *Texas,* 388 U.S. 14, 17–18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); *State* v. *McKnight,* 191 Conn. 564, 581, 469 A.2d 397 (1983).

Whether a trial court's restriction of a defense witness' testimony in a criminal trial deprives a defendant of his due process rights is a question that must be answered on a case-by-case basis. *State* v. *Flanders,* 214 Conn. 493, 500, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990). In this case, Sereny was consulted only one to two weeks prior to the trial, and not as an expert witness. There is no indication that the defendant intended to utilize the services of Sereny without informing the prosecuting authority. Furthermore, allowing the state to present the testimony of Fredericks regarding the mental state of the defendant, without allowing the defense to rebut such testimony, whether on cross-examination or by presenting its own witness and regardless of whether the defendant complied with the notice requirements of § 759, would be fundamentally unfair. Therefore, we hold that the court's interpretation of §§ 759 and 761 resulted in an abuse of discretion.

Even if we were to hold that the trial court's decision to sustain the objection was not an abuse of discretion, the state did, in fact, open the door to evidence of the nature of the defendant's injuries by its questioning of Fredericks. "Generally, a party who delves into a particular subject during the examination of a witness cannot object if the opposing party later questions the witness on the same subject. . . . The party who initiates discussion on the issue is said to have 'opened the door' to rebuttal by the opposing party. Even though the rebuttal evidence would ordinarily be inadmissible on other grounds, the court may, in its discretion, allow it where the party initiating inquiry has made unfair use of the evidence." *State* v. *Graham,* 200 Conn. 9, 13, 509 A.2d 493 (1986). Once the door has been opened, the trial court must then engage in a balancing test to determine whether further inquiry by the opposing party is proper in order to undo any unfair prejudice that may have resulted from the original testimony. Id., 14.

The record indicates that the following colloquy took place between the state and Fredericks on direct examination during the state's case-in-chief:

"The State: Doctor, did you have an opportunity to examine medical records regarding an individual named Robert Arbour, Jr.?

"The Witness: Yes.

"The State: And drawing your attention to those records, can you tell us what was the nature of Mr. Arbour Jr.'s—Robert—I want to be specific because they're the same last names—Robert Arbour, Jr., what his injury was?

"The Witness: The records indicate that he had blood trauma to the left frontal region with subsequent swelling in that area. He was described by the EMT peo-

ple, as the emergency medical technician described him, as being lethargic and not fully aware of what was going on at the time that he was found at home and brought to the emergency room. In the emergency room he was able to respond to simple commands. The notes in the record then say that within thirty minutes he was asking questions about his family and was responding more appropriately. There was no loss of consciousness mentioned in the records, except there was one contradictory note that was mentioned on his physical examination sheet.

"The State: Now, Doctor, if someone received an injury of that nature, can you tell us, based upon a reasonable medical certainty—excuse me—reasonable medical probability, if he would become incoherent right after receiving that injury, or if that incoherence would be somewhat delayed; it may be some ten or fifteen minutes afterwards?

"The Witness: From that type of injury, if he were to be incoherent, I would expect it to be right from the beginning of the injury. We found no evidence that he had subsequent hemorrhage. That would be an explanation if someone initially was clear and then had difficulty with memory, but he had a CAT scan which showed no abnormality. There was no indication he had what they call an epidural hematoma.

"The Court: This is what the CAT scan found?

"The Witness: The CAT scan was normal. There was no evidence of any hemorrhage or any brain injury, such as what they call a contusion of the brain.

"The Court: You said an epidural hematoma?

"The Witness: I was merely trying to clarify the fact that there are instances where someone can have a head injury and initially be bright and mentally okay

and then lapse into periods of memory difficulty or loss of consciousness, but he did not have that type of problem.

"The State: Thank you, Doctor. I have nothing further of this witness."

The defendant, during its case-in-chief, called Sereny and posed the following question: "On the basis, Doctor, of your examination of the hospital record of Robert Arbour, Jr., on the basis of the injuries that are described therein, and the other information contained in that report, and, Doctor, assuming that earlier in that evening, when police officers entered a dwelling—a house or unit—or the dwelling in which he was present, that he was dazed, incoherent, disoriented, unable to focus his eyes, that he was hysterical at times, do you have an opinion about what his ability to form a rational intent would have been at about 7:30 that evening, after he had received the injury that we've described?"

At that point, the state objected, and the trial court sustained the objection on the basis that the defendant failed to comply with Practice Book §§ 759 and 761. The court, the next day, also stated that the state did not open the door to this line of questioning when it presented the testimony of Fredericks.

Despite the holding of the trial court and the arguments of the state that Fredericks' testimony was limited in its scope, the testimony demonstrates that the questions posed to Fredericks plainly addressed the effect the injury had on the defendant at the time of the incident. Although the questions posed to Fredericks were not in a form that specifically addressed the defendant's ability to form a rational intent, the practical effect is the same. It would be grossly unfair to allow the state to question its expert regarding the defendant's incoherence—state of mind—without allowing the defendant a similar opportunity.

Once the state's attorney asked Fredericks about the defendant's injuries and whether incoherence would be expected "right after receiving that injury" or would be "somewhat delayed" and Fredericks, an expert witness, stated that "from that type of injury, if [the defendant] were to be incoherent, I would expect it to be right from the beginning of the injury," the state's attorney opened the door to questions relative to the diminished capacity of the defendant. This evidence followed closely the testimony elicited from various police officers, all called by the state, as to the defendant's mental, emotional and physical state in which he was described as dazed, unable to focus his eyes or attention, glassy eyed, unconscious, and that he did not intentionally shoot his brother. In addition, testimony came before the jury that the defendant looked calm and alert.

That testimony went to the very heart of the defense. The defendant attempted to counter that testimony by the question addressed to Sereny and disallowed by the trial court. The examination by the state's attorney delved into those areas on which the defendant was prohibited to inquire. It was these questions that brought into focus an issue to be decided by the jury; that is, whether the defendant had the requisite intent to commit the crime. Once the mental, emotional and physical state of the defendant became the subject matter of questions on direct examination, it was an abuse of discretion not to allow the defendant to inquire of Sereny as to his opinion of the defendant's ability to form a rational intent.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.