STATE OF CONNECTICUT *v.* SCOTT CAVELL
(10605)

O'CONNELL, FOTI and HEIMAN, Js.

Argued November 8, 1993—decision released May 10, 1994

*Richard Emanuel,* assistant public defender, for the appellant (defendant).

*Susan C. Marks,* assistant state's attorney, with whom, on the brief, were *James E. Thomas,* state's attorney, and *John M. Massameno,* assistant state's attorney, for the appellee (state).

FOTI, J. The defendant appeals from the judgment of conviction,[1] rendered after a jury trial, of sexual

---

[1] The defendant was found not guilty of one count of kidnapping in violation of General Statutes § 53a-92 (a) (2) (A), and one count of sexual

assault in the first degree in violation of General Statutes § 53a-70.[2] The defendant claims that the trial court improperly (1) allowed the state to present rebuttal evidence, and, alternatively, precluded the defense from presenting surrebuttal evidence, (2) excluded certain testimonial evidence, and (3) instructed the jury. We affirm the judgment of the trial court.

The jury could reasonably have found the following facts. The victim lived with her husband and their four children in a house owned by her mother in Cheshire. On the evening of May 3, 1990, the victim became involved in an argument with her mother. Following the disagreement, she left the house with her children and began driving to her grandmother's house. The police, who had been contacted by a family member, stopped her vehicle and arrested her for disorderly conduct and criminal mischief. The children were taken home and the victim was taken to the police station.

After being processed, the victim was unable to contact her husband and called a friend, who picked her up at the police station. The police had advised her against returning home until things had cooled off, so her friend dropped her off at a local bar about midnight. She again unsuccessfully attempted to contact her husband by telephone. She ordered a drink at the bar and began talking about her arrest to the defendant, whom she did not know. He introduced her to his girlfriend who had just arrived at the bar. The victim told the defendant that she was unable to locate her husband

___

assault in the first degree in violation of General Statutes § 53a-70 (a), which specifically charged sexual assault by compelling fellatio.

[2] General Statutes § 53a-70 (a) provides in pertinent part: "A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person . . . ."

for a ride home and accepted the defendant's offer of a ride. As the three left the bar, the victim realized that the defendant and his girlfriend were in separate cars. The defendant told his girlfriend that he was going to drive the victim home and would meet her at her house in about ten minutes.

As the defendant pulled out of the parking lot with the victim as a passenger in his car, he was stopped by the police and received a verbal warning because one of the car's lights was inoperative. As the defendant drove, the victim gave him directions to her house, but he turned instead onto a gravel road leading to the Southington Sportsmen's Club. The defendant parked the car in front of the dark clubhouse, walked around to the passenger door and asked the victim to get out. When she refused, he grabbed her by the hair, pulled her out of the car and dragged her across the parking lot to a pile of leaves. He overcame her resistance and put his penis in her mouth. She distracted him by saying someone was standing behind him, and when he jumped up to look, she ran to the car. The defendant followed her, grabbed her by the throat, hit her and threatened to kill her. He stated that if she resisted, he would sexually assault her with a beer bottle. He then had vaginal intercourse with her on the passenger side of the front seat. Thereafter, the defendant drove the victim home. As she exited the vehicle, she noted the license plate number and called the police.

## I

The defendant's first claim is bifurcated. He initially claims that the trial court improperly allowed the state to present forensic evidence in rebuttal that should have been presented as evidence only in the case-in-chief. Second, the defendant claims that if that evidence was properly admitted, the court improperly prevented him from presenting surrebuttal evidence.

At trial, the defendant testified that it was the victim who had asked him to take her someplace secluded and that she had consented to intercourse. He further testified that the sexual intercourse had taken place in a leafy area on the ground away from the car. He stated that on the ride back to her house, she had pulled leaves and debris out of her hair with her fingers because she did not have a comb or brush. During cross-examination, the defendant denied having had intercourse with the victim in the front seat of the car.

The defense case took eight days beginning May 15, and ending May 29, 1991. The defendant testified on May 20, 21, and 22. On the final day of defense testimony, the assistant state's attorney announced that he had just handed defense counsel a one page forensic report that had been received the previous day from the state criminal forensic laboratory in Meriden. Although there had been evidence presented that hair and vegetative material had been found on the front seat of the automobile, no tests had been made on the stain on the cover of the front seat. The day following the defendant's testimony, the state had the stain tested and offered the result of that forensic report as rebuttal evidence. The defendant objected, arguing that such evidence constituted an unfair surprise and would be highly prejudicial. The state argued that because consent was the defense to the allegations of sexual assault, the fact that sexual intercourse had occurred had not previously been disputed. It was not until the defendant denied the victim's account that he had ejaculated in the front seat that the issues arose as to where the intercourse had occurred and the credibility of both parties.

The court inquired as to how the defense would have altered its posture in the case had it received the forensic report earlier or had the results been presented by the state in its case-in-chief. Defense counsel indicated

that he could have had the seat tested independently and may have had the defendant testify with regard to sexual activity in the front seat at other times. The court overruled the defendant's objection to allowing the rebuttal evidence and noted that had the results been negative, they would have had to have been disclosed to the defendant as exculpatory material, obviating the need for an independent test. The court also refused to rule on the defendant's request for permission to put on surrebuttal evidence at that time, but indicated that it would await cross-examination of the witness presenting the rebuttal evidence and consider whatever the defendant wished to present as surrebuttal through an offer of proof.

The rebuttal evidence consisted primarily of the testimony of a criminologist at the state laboratory that the front seat stain tested positive for the presence of semen and that spermatozoa in the stain were consistent with the defendant's blood type. On cross-examination, the witness indicated that there was no way to determine the age of the stain, that 36 percent of the population have the defendant's blood type, and that no attempt had been made to determine whether the vehicle had prior owners or whether any sexual activity had taken place on that front seat prior to the assault. The witness also indicated that no instruction had been given, prior to May 23, 1991, not to perform tests on the stain.

A

The defendant alleges that the court abused its discretion in permitting the state to introduce the rebuttal evidence. We do not agree.

" '[R]ebuttal evidence is that which refutes the evidence presented by the defense, rather than that which merely bolsters the state's case . . . .' " *State* v. *Williamson*, 206 Conn. 685, 698, 539 A.2d 561 (1988); *State*

v. *Lisella,* 187 Conn. 335, 337, 445 A.2d 922 (1982); *State* v. *Young,* 29 Conn. App. 754, 763, 618 A.2d 65 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287 (1993); *State* v. *Maxwell,* 29 Conn. App. 704, 715, 618 A.2d 43 (1992), cert. denied, 225 Conn. 904, 621 A.2d 287, cert. denied, U.S. , 113 S. Ct. 3057, 125 L. Ed. 2d 740 (1993). "Rebuttal evidence is usually confined to testimony which is directed at refuting the evidence given by the defendant . . . or is in general contradiction of the testimony given by the defendant . . . . The admission of rebuttal evidence is ordinarily within the sound discretion of the trial court. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Canty,* 223 Conn. 703, 715–16, 613 A.2d 1287 (1992); see also *State* v. *Williamson,* supra, 697–98. A trial court is vested with broad discretion in determining the relevance and admissibility of evidence. *State* v. *Bunkley,* 202 Conn. 629, 648–49, 522 A.2d 795 (1987). Further, every reasonable presumption will be given in favor of upholding the court's ruling when ascertaining if the ruling amounted to an abuse of discretion. *State* v. *Colon,* 28 Conn. App. 231, 236, 611 A.2d 902, cert. denied, 223 Conn. 922, 614 A.2d 827 (1992).

The defendant principally argues that the evidence should have been presented in the state's case-in-chief and not as "rebuttal." We cannot conclude that merely because evidence is admissible during the case-in-chief it is inadmissible on rebuttal. The defendant acknowledges this, but argues that admission of this rebuttal evidence was improper in light of the relevant circumstances. Specifically, he cites "the introduction of other related forensic evidence in the case in chief, the questionable probative value of the evidence, the reason for the unavailability of the forensic evidence during the case in chief, and the very late disclosure of the results

to the defense."[3] He claims that this clearly made the forensic evidence testimony admissible in the case-in-chief and not properly admissible as rebuttal evidence. We do not agree.

The state presented sufficient evidence in its case-in-chief for a prima facie showing of a violation of the criminal statute. The rebuttal evidence was neither necessary for the state's case-in-chief nor introduced to bolster that case. None of the evidence in rebuttal was probative of whether the act of sexual intercourse had occurred or whether there was a lack of consent to the sexual intercourse. Rather, it was probative of the *place* where the act occurred, which addressed the issue of the credibility of the victim and the defendant. It was not until the defendant refuted the victim's testimony that intercourse had taken place in the car, together with other defense evidence tending to show that the victim's injuries could have been caused on the ground, that the forensic evidence became relevant to refute that evidence. Under these circumstances, it was well within the discretion of the trial court to allow the evidence in rebuttal.[4]

---

[3] The defendant acknowledges that the parties and the trial court did not address the question of relevancy, but implies that the evidence may not have been relevant unless the state could show that the semen stain was made by the defendant at the time of the alleged sexual assault. Relevant evidence is evidence that advances the inquiry to some degree, and is material and probative. *State* v. *Young*, supra, 29 Conn. App. 763. "We have also held that evidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Sauris*, 227 Conn. 389, 406, 631 A.2d 238 (1993). The evidence was both admissible and relevant.

[4] Having so concluded based on evidentiary grounds, we therefore find it unnecessary to determine whether the defendant's claim involves a state or federal constitutional right and whether he has the burden to demonstrate harmfulness. *State* v. *Vilalastra*, 207 Conn. 35, 46, 540 A.2d 42 (1988); *State* v. *Bryant*, 202 Conn. 676, 692 n.15, 523 A.2d 451 (1987).

## B

The second part of the defendant's claim is that, if the trial court properly allowed the evidence as rebuttal, it improperly refused to allow the defense surrebuttal.

As discussed in part I A of this opinion, the admission or exclusion of rebuttal or surrebuttal evidence lies in the sound discretion of the trial court. See *State* v. *Simino*, 200 Conn. 113, 123, 509 A.2d 1039 (1986); *State* v. *Lisella*, supra, 187 Conn. 337; *State* v. *Nims*, 180 Conn. 589, 599, 430 A.2d 1306 (1980); *State* v. *Palozie*, 165 Conn. 288, 299, 334 A.2d 468 (1973); *State* v. *Leopold*, 110 Conn. 55, 67, 147 A. 118 (1929).

The record is clear that when ruling to allow the rebuttal evidence by the state, the trial court made no ruling disallowing surrebuttal. When asked about allowing surrebuttal, the court stated: "There's no ruling on that. I'll see what the cross-examination develops and I'll see what kind of an offer of proof you have as to what you're talking about on surrebuttal. Those are very unusual circumstances and only if the court could be absolutely satisfied that you were somehow impaired and impeded from presenting a full and effective defense would the court then consider it and only if I thought some manner of bona fide surprise had resulted.

"But you understand that [the victim] testified about six, seven weeks ago and she testified at great length that the hair on her head was extracted during the dragging and during the interaction on the front seat of that car. She also testified that the intercourse occurred on the front seat of the car.

"Now to the extent that the automobile was there, and that the seats were available for examination by

the defense at any time in the last six weeks, the defense could have requested that scientific testing be done by its own laboratories and that seat would have been made available so that they could have determined that [the victim's] story was incorrect. Now once [the victim] testified that vaginal intercourse has occurred in the front seat, the defense could have taken advantage of the fact that no semen or spermatozoa or stains were to be found in the entire front seat area of the car, but they elected not to do so and they elected to rest upon the defendant's testimony that any ejaculation occurred seventy-two feet away from the car. Once the defendant testified, he then opened himself to an attack on rebuttal by any physical or scientific or forensic evidence that could refute his testimony. The court finds absolutely no bad faith on the part of the state's attorney's office."

The defendant cross-examined the state's rebuttal witness and established that the stain could have been on the seat "forever," even at the time the car was manufactured, that there was no way to determine the age of the stain, or whether it resulted from this or other sexual activity. Thereafter, the defendant's counsel requested surrebuttal, but made no offer of proof, did not request permission to make an offer of proof, and did not identify any witnesses he proposed to call, including the defendant.[5] The record indicates the following:

---

[5] Previously, during argument regarding the defendant's objection to the state's offer of rebuttal evidence, the defense counsel had stated: "And I would submit, Your Honor, we're not talking about the defendant running the risk of perjury, Your Honor. What we're talking about is the defendant telling his story which is incomplete if the state intends to go into this area. That version of the story that is incomplete is with regard to other sexual activity in that front seat, that the defendant could have very well testified to if we were aware that there was such material, such as this forensic report that the state wishes to rely on . . . . It's a question of the whole truth coming out, and that has to do with other activities other than May 4, 1990, in the front seat of that car."

"[Defense Counsel]: In light of the rebuttal, specifically with regard to the portion of the front seat that was introduced . . . . What I meant, Your Honor, is that they had it [the seat] in their possession. It's indicated 'stains' on the evidence sticker and, in fact, nothing is done with regard to the stains until . . . the very last day after we've rested our case, we're given a supplemental forensic report indicating that, in fact, a test was done with regard to the stains and indicating there was some evidence of spermatozoa on the front seat. It was very damaging testimony as far as the defendant is concerned so I would ask the court to allow the defense to submit evidence in surrebuttal of that particular item; it would be limited to that, Your Honor.

"The Court: Your purpose would be to have a laboratory examine all items?

"[Defense Counsel]: If possible, Your Honor

"The Court: Have you contacted a laboratory?

"[Defense Counsel]: No, I have not.

"The Court: Clearly, it would be such a disruptive breach of the trial process, I'll comment in a few minutes, but I thought the cross-examination clearly and carefully protected the defendant's posture."

Thereafter the court denied the defendant's request for surrebuttal and commented as follows: "The point clearly is that once you rest, your case has been concluded and to suggest that there was a surprise on rebuttal while you had in your possession the supplemental forensic report as pertains to the spermatozoa stain on the front passenger seat of the car before you rested and then to argue that you were surprised on rebuttal simply is without merit and flawed. Let me make the following observation as I feel required to do so.

"First, at this juncture a request for a surrebuttal is an extraordinary measure rarely recognized in our state. Defense has presented no legal authority to warrant the exercise of such an extraordinary measure. Second, this case has extended over a period of two months. Part of the reason for that extension is a two week recess which was granted to the defense without preparation after the jury was selected. The court notes that the victim in this case was cross-examined for a period of nearly five days. The defense of consent was announced prior to taking testimony in this trial. The victim six weeks ago testified that vaginal intercourse occurred in the right front passenger seat of the defendant's car and that the defendant ejaculated semen during the vaginal intercourse. This knowledge was made available to the defendant more than six weeks ago.

"Six weeks ago the defense was aware that the defendant would testify that the vaginal intercourse occurred seventy feet away from the car in the so-called leafy area. Now, our Practice Book allowed the defendant the right to scientifically examine the front passenger seat. In view of the victim's testimony, such an examination should have been requested six weeks ago. No request has been made until this very moment or sometime yesterday.

"The examination of the front passenger seat by the state was as a consequence of the defendant's testimony that the vaginal intercourse occurred in the leafy area and not the car. The state was always aware that the defense would be consent and was never alerted or aware that there would be a discrepancy in the testimony of the victim or the testimony of the defendant as to where the vaginal intercourse occurred.

"The state was unaware until the defendant testified on or about May 23, 1991, that the vaginal inter-

course resulted in the leafy area. Thereafter, the state took prompt measures to examine the seat for evidence of sperm. The supplemental forensic report was turned over to defense counsel at the earliest possible date. In undertaking that scientific examination, the state assumed the calculated risk. Had the front passenger seat shown no traces of sperm, this evidence could have been treated as exculpatory and the defense surely would have used this state experiment to support the defendant's version and attack the victim's version of what transpired that evening. The cross-examination of [the state's] rebuttal witness was effective and established that, one, the authorship of the sperm could not be specifically identified and, two, the evidence of sperm could have been there indefinitely, raising the implication that it was deposited there at an earlier time or at a time prior to May 4, 1990.

"Finally, surrebuttal is required only when there is a manifest act of injustice reaching constitutional proportions. Because the state exercised good faith, because the experiment could have fallen either way, and especially because the defense had substantial advance notice to early resolve this issue, the motion for surrebuttal is denied and exception for the record is noted."[6]

The trial court, taking into consideration the defendant's cross-examination of the state's rebuttal witness, in effect determined that the defendant had not been unduly surprised in that there was no bad faith on the part of the state's attorney in failing to have the stain tested earlier. The defendant made no definite request, nor suggested a definite period for a continuance to accomplish what he intended in response to the rebut-

---

[6] We note that the proper standard for the admission of surrebuttal evidence is not this rigorous. Since we conclude, however, that the court acted within its discretion, we find the application of a higher standard to be harmless.

tal testimony. He had not looked into the possibility of an additional forensic test at that time, nor did he specifically request permission to submit surrebuttal evidence consisting of testimony relating to other sexual activity in the car. The record discloses no offer of proof, nor a request to present any specific rebuttal evidence.[7]

Even if we were to assume that the defendant's actions were sufficient and the evidence proffered was relevant and material to the defendant's credibility, "the trial court's decision will be reversed only where abuse of discretion is manifest or where an injustice appears to have been done. . . . Our review is limited to whether the trial court's ruling exceeded the latitude accorded its discretion in such matters. . . . Every reasonable presumption should be given in favor of the trial court's ruling. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Sierra*, 213 Conn. 422, 434–35, 568 A.2d 448 (1990). We cannot conclude, after a review of the record, that the trial court abused its discretion by not allowing surrebuttal evidence.

## II

The defendant next claims that the trial court improperly excluded the testimony of an expert witness

---

[7] Although an offer of proof may not always be necessary, a reviewing court may be unable to determine the propriety or effect of the exclusion unless the substance of the proffered evidence is disclosed in the record. In that event, counsel should make an offer of proof, in the absence of the jury, stating the purpose of the offer and disclosing the content and purport of the expected testimony. *State* v. *Conrod,* 198 Conn. 592, 597, 504 A.2d 494 (1986); *State* v. *James L.,* 26 Conn. App. 81, 84–85, 598 A.2d 663 (1991); C. Tait & J. LaPlante, Connecticut Evidence (2d Ed. 1988) § 3.5.5 (b). "In the absence of an appropriate offer of proof, this court cannot speculate as to what line of questioning defense counsel intended to follow. A claim on appeal cannot be based on an assumption that the trial court acted improperly. . . . Without an adequate record on which to review the rulings of the trial court, this court must assume that the trial court acted properly." (Citation omitted.) *State* v. *James L.,* supra, 85–86.

because of an alleged violation of a sequestration order. The defendant argues that the trial court improperly found a violation, or imposed an excessive sanction for that violation. We conclude that any error was harmless under the particular circumstances of this case.

The following facts are relevant to this claim. Prior to the presentation of evidence, neither the state nor the defense moved for an order of sequestration. The trial commenced after a specific inquiry by the court regarding a motion for sequestration of witnesses. Among the witnesses called by the state were Sultan Quarishi, the emergency room physician who examined the victim after the assault, and Officer Clifford Saucier of the Southington police department, who took the victim's formal statement.

After the state had rested, the defense asked that the state be prohibited from having Saucier sit next to the state's attorney at counsel table. The state's attorney pointed out that there was no sequestration order in the case, that Saucier had functioned as an "adjunct assistant" in the office of the state's attorney in the past, and that the assigned inspector was on vacation.

The trial court expressed reluctance to require the prosecution to proceed without an assistant and stated that, in the absence of a sequestration order, a cautionary instruction to the jury would be sufficient to remove the possibility that the presence of Saucier at counsel table would cause the jury to accord any greater weight to his earlier testimony. The defendant then requested an order of sequestration pursuant to Practice Book § 876,[8] which the court granted. The state thereupon requested a mutual sequestration order. The court

[8] Under General Statutes § 54-85a and Practice Book § 876, any party in a criminal matter is entitled upon motion to have witnesses sequestered. A sequestration order generally prohibits a sequestered witness from being present in court when not testifying.

entered the following order which exceeded the state's request: "[M]y sequestration order will apply to witnesses both for the state and for the defense. Also, as to those witnesses that testified previously and/or may testify in the future. The sequestration order, because it's now affecting a witness who has already testified for the state will also apply for the defense. Those witnesses who have testified for the defense will not be allowed access into this courtroom while the case is on trial so that the application is made fairly to both sides. Then, of course, the order should include that no witness who has concluded testifying, and the attorneys will so advise them, not to communicate with any other witnesses as to what they were asked or what they answered."

During the defendant's case-in-chief, he called as a witness Michael Conroy. After testifying as to his credentials as a surgeon, Conroy testified that he had reviewed the victim's medical records. The state asked for an offer of proof regarding Conroy's anticipated testimony. During the offer of proof, Conroy testified that he visited the Southington Sportsmen's Club, viewed a leafy area some distance from the parking area, reviewed the photographs of the victim, and reviewed the testimony of Quarishi.

Conroy was then asked whether, on the basis of these reviews, he could render an opinion as to whether the injuries sustained by the victim were consistent with her having had active sexual intercourse in the area viewed by him at the club. He responded that he could render an opinion that the injuries sustained by the victim were consistent with active sexual intercourse. He also stated that he did not think the injuries were consistent with the victim's having been pulled head first, because that type of motion would have caused her shirt to stay down, keeping her back protected.

Following the voir dire, the assistant state's attorney pointed out that Conroy had admitted to having reviewed the testimony of a prior witness in violation of the sequestration order. The state asked that, as a sanction, Conroy not be permitted to testify. The court granted the state's request and determined that, because of the various days of court recess, defense counsel would have nine days in which to locate another medical expert. The trial court then recalled the jury and had the testimony of Conroy stricken. The jury was not told the reason for striking the testimony, only that Conroy could not testify.

On May 29, the defense called a surgeon, Jack Huse, as a witness. Huse testified that he had reviewed the victim's medical records, photographs of the victim and that he had gone to the Sportsmen's Club to examine the terrain in an area indicated by the defendant. He testified that the victim's injuries were consistent with active sexual intercourse on the ground, stating: "You're looking at activities which involved a variation in positioning of the body, and activities could have caused the body to come in contact with the terrain that we've recently seen, and then injuries that are certainly consistent with that terrain and the activities that have been described."

Huse stated that, assuming the victim had a blood alcohol level of approximately 0.20 percent at the time of the sexual activity, her ability to perceive pain would have been diminished. He also expressed an opinion that the hair found in the defendant's car could have come from the victim's running her hands through her hair to remove debris, not from forceful pulling. Huse testified additionally that it is very difficult to drag someone by the hair from behind, and that it would have been difficult for the victim to have sustained the back injuries she suffered in this manner.

The defendant claims that the exclusion of Conroy's testimony violated his right to present a defense under the federal and state constitutions.[9] As we have said, "[e]ven were we to decide that the trial court's remedy was excessive under these circumstances, the striking of [the witness'] testimony was harmless since its substance was presented by [another witness]. . . . We conclude, accordingly, that the remedy applied by the trial court for a violation of its sequestration order did not deprive the defendant of [his] constitutional rights." *State* v. *Crumble,* 24 Conn. App. 57, 62, 585 A.2d 1245, cert. denied, 218 Conn. 902, 588 A.2d 1077 (1991). Because we determine that if any error did occur, it was harmless, we need not determine whether the trial court improperly found a violation of its sequestration order, or whether the court imposed an excessive sanction by excluding Conroy's testimony.

The defendant argues that, even if the voir dire testimony of Conroy was facially identical to the actual testimony of Huse before the jury, the comparison is not a true one. The defendant argues that expert witnesses are not fungible, that one witness may have more "presence" and greater credibility than another, and may be viewed by the trier of fact as more persuasive.

We agree that doctors are not fungible, but Conroy and Huse were very similar for the purposes of testifying for the defense. Both are surgeons and neither had any particular expertise in crime scene reconstruction. We have reviewed the record, including the defendant's offer of proof as to the essence of Conroy's testimony. The record supports the trial court's determination that the testimony the defendant was seeking to introduce through Conroy was that the victim's injuries were con-

---

[9] The defendant has not provided an independent analysis of our state criminal constitutional provisions; therefore, we decline to review that claim. *State* v. *Perez,* 218 Conn. 714, 723, 591 A.2d 119 (1991).

sistent with active sexual intercourse and were not necessarily the product of force. This testimony *was* introduced through the substituted testimony of Huse. Because the testimony of Huse was equivalent to that intended by Conroy, the exclusion of Conroy's testimony, even if improper, was not harmful error.

We cannot speculate as to which witness, Conroy or Huse, may have been more credible to the jury. We cannot agree with the defendant that, merely because Conroy was his first choice, Conroy would necessarily have been better than his second choice, Huse. When an issue in a criminal case does not involve a constitutional violation, the burden is on the defendant to demonstrate the harmfulness of the error. *State* v. *Johnson,* 29 Conn. App. 394, 400, 615 A.2d 512 (1992), appeal dismissed, 227 Conn. 611, 630 A.2d 69 (1993). The defendant has not shown that the result would have been different had the trial court permitted Conroy to testify. The defendant has failed to demonstrate that the exclusion of Conroy's testimony was harmful.

### III

Finally, the defendant claims that the trial court improperly instructed the jury. The court instructed in pertinent part as follows: "Now in this case you heard testimony from [a] witness . . . as concerns the defendant's trait of nonviolence. In the criminal case the defendant has a right to submit before you evidence of a specific trait in order to create in your minds the belief that it was improbable that he committed the act or acts for which he is presently being tried. It is within your province to accept or reject this testimony. Evidence of a specific trait of nonviolence is not of itself sufficient to raise a reasonable doubt of guilt of the defendant. . . . Evidence of the witness' personal opinion in order to raise a reasonable doubt of guilt must be believed by you. This trait evidence when con-

sidered with all the other evidence in the case may be sufficient to raise a reasonable doubt in your minds as to his guilt."

At trial, the defendant agreed to the correctness of this instruction.[10] He now claims that the trial court erroneously instructed that the defense evidence of nonviolence was not of itself sufficient to raise a reasonable doubt. He argues that while his claim was not preserved at trial, review is warranted as plain error. Practice Book § 4185. We do not agree.

Plain error review "is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. *State* v. *King,* 216 Conn. 585, 591, 583 A.2d 896 (1990). The claimed error here is not so egregious or obvious as to merit such review." (Internal quotation marks omitted.) *State* v. *Sawyer,* 32 Conn. App. 854, 857, 632 A.2d 372 (1993). Our review of the charge as a whole leads us to conclude that it was not likely that the jury was misled. The instructions read as a whole did not result in an "unreliable verdict or miscarriage of justice. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Harvey,* 27 Conn. App. 171, 187, 605 A.2d 563, cert. denied, 222 Conn. 907, 608 A.2d 693 (1992). Plain error review is not warranted.

The judgment is affirmed.

In this opinion HEIMAN, J., concurred.

O'CONNELL, J., concurring in part and dissenting in part. I agree with parts I and III of the majority

[10] The defendant indicates that there was some confusion as to what the court actually instructed and what was read aloud from the court's notes during counsels' exceptions to the charge. Regardless, the transcript shows that the charge to which defense counsel ultimately agreed was the one given to the jury.

opinion, but I cannot concur with part II of the majority opinion on the sequestration issue.

This was not a typical sequestration situation in which the trial court, at the request of counsel, imposed a sequestration order at the commencement of trial. See General Statutes § 54-85a;[1] Practice Book § 876.[2] Here, immediately prior to the commencement of evidence, the court inquired whether either party intended to make a motion to sequester witnesses. The state and defense both declined to make such a motion and the trial started with no sequestration order in effect. Sultan Quarishi testified as the state's medical expert witness and was cross-examined by defense counsel. On May 14, 1991, the state completed its case-in-chief without a sequestration order in effect.

At the opening of court the following day, and before starting his evidence, the defendant objected to the fact that a Southington police detective, who had testified, was sitting beside the state's attorney at counsel table. This resulted in the entry of a midtrial sequestration order.[3]

---

[1] General Statutes § 54-85a provides: "In any criminal prosecution, the court, upon motion of the state or the defendant, shall cause any witness to be sequestered during the hearing on any issue or motion or any part of the trial of such prosecution in which he is not testifying."

[2] Practice Book § 876 provides: "The judicial authority upon motion of the prosecuting authority or of the defendant shall cause any witness to be sequestered during the hearing on any issue or motion or during any part of the trial in which he is not testifying."

[3] The court's order went beyond the simple sequestration order requested by the parties and provided as follows: "Well, my sequestration order will apply to witnesses both for the state and for the defense. Also as to those witnesses that testified previously and/or may testify in the future. The sequestration order, because it's not affecting a witness who has already testified for the state will apply for the defense. Those witnesses [who] have testified for the defense will not be allowed access into this courtroom while the case is on trial so that the application is made fairly to both sides. Then, of course, the order should include that no witnesses who have concluded testifying and the attorneys will so advise them not to communicate with any other witnesses as to what they were asked or what they answered."

The defendant called Michael Conroy to testify as a medical expert, to challenge the likelihood that the victim sustained her injuries in the manner she claimed. Conroy admitted that, in preparation for his testimony, he reviewed a transcript of Quarishi's cross-examination. The court ruled that this transcript review constituted a violation of the sequestration order and barred Conroy from testifying. The court, however, gave the defendant time to find a medical expert to replace him. Aided in part by a long hiatus in the trial due to a weekend and a holiday, the defendant obtained Jack Huse, who testified in lieu of Conroy.

## I

### VIOLATION?

We should first consider the threshold question of whether the sequestration order was violated. I commence my analysis by noting that when Quarishi testified, the sequestration order had not yet been entered. Conroy could have been present in the courtroom and listened to Quarishi's testimony. Likewise, Conroy lawfully could have read the transcript of Quarishi's testimony any time between May 8, 1991, when Quarishi testified and the morning of May 15, 1991, when the sequestration order was entered. Conroy, however, candidly admitted that it was on May 20, the evening before he testified, that he reviewed Quarishi's cross-examination. There was no evidence to indicate that Conroy had been informed that his right to read the transcript had terminated on the morning of May 15. The state argues that Conroy's review of Quarishi's testimony on cross-examination was a direct violation of the sequestration order. I do not agree.

First, it is my opinion that this unusual fact pattern suggests very strongly that no violation took place. If Conroy had read the transcript prior to May 15, there clearly would not have been a violation. The record does

not disclose whether the transcript was delivered to Conroy before or after the order entered and I presume that defense counsel, as an officer of the court, did not flaunt the order and deliver the transcript to Conroy after the order was in effect. See *State* v. *Falby,* 187 Conn. 6, 26–27, 444 A.2d 213 (1982). Accordingly, since Conroy had a transcript lawfully in his possession, I would not find a violation merely because Conroy's schedule called for him to read it the night of May 20, rather than at an earlier time.

Second, the midtrial sequestration order was ambiguous as to whether it applied retroactively to witnesses who had already testified. If the "enforcement [of sequestration orders] is to work justice and not injustice, care must be taken by the trial courts and by counsel to insure that those orders are *plainly announced* and that *their effect is made clear to all witnesses.*" (Emphasis added.) *Jury* v. *Commonwealth,* 10 Va. App. 718, 722, 395 S.E.2d 213 (1990). There is no evidence that Conroy was aware of the order when he read the transcript. Furthermore, I would give the defendant the benefit of the order's ambiguity.

Third, "[t]he primary purpose of a sequestration order is to ensure that the defendant receives a fair trial by preventing witnesses from shaping their testimony to corroborate falsely the testimony of others. *State* v. *Pikul,* 150 Conn. 195, 200, 187 A.2d 442 (1962). . . . An inquiry into the facts and circumstances of each case is necessary to ascertain whether the purpose of a sequestration order has been thwarted." (Internal quotation marks omitted.) *State* v. *Crumble,* 24 Conn. App. 57, 61, 585 A.2d 1245, cert. denied, 218 Conn. 902, 580 A.2d 1077 (1991).

In the present case, the state does not claim that the alleged violation was committed so that Conroy could

shape his testimony falsely to corroborate Quarishi's testimony. In fact, the contrary is true. In an offer of proof, Conroy testified that he gleaned nothing of substance from Quarishi's testimony because it dealt with matters not directly related to his opinion.

In my opinion, the peculiar temporal circumstances of this case do not support a finding that the sequestration order was violated.

## II

### HARMLESS ERROR

The majority does not determine whether a violation occurred but proceeds directly into a harmless error analysis. Even if there had been a violation, I cannot agree that the defendant suffered no harm solely because he was able to substitute Huse for Conroy. That Huse gave the substance of what would have been Conroy's testimony does not necessarily lead to the conclusion that the defendant suffered no harm. Medical experts are not fungible.

The rule that we will not consider a challenge to the exclusion of evidence if the evidence in question has otherwise entered the case; *State* v. *Suckley,* 26 Conn. App. 65, 73, 597 A.2d 1285, cert. denied, 224 Conn. 901, 600 A.2d 1028 (1991); is inapposite here. There is a tremendous difference between application of the rule to factual witnesses and to expert witnesses. Parties must accept the factual witnesses that the case deals them. The selection of an expert witness, however, is an important skill in the art of lawyering. It is often difficult to locate the precise expert who, in an attorney's professional opinion, possesses the qualifications, persuasive presence and credibility required in a particular case.

It is axiomatic that in judging credibility, the jury has a right to observe the appearance and demeanor of wit-

nesses. *Edens* v. *Kole Construction Co.,* 188 Conn. 489, 494–95, 450 A.2d 1161 (1982). That rule applies to expert witnesses. 5 Connecticut Practice, D. Borden & L. Orland, Criminal Jury Instructions (1986) § 3.12. The state compares Conroy with Huse and concludes that one was as good as the other; hence, the defendant has not suffered even if the court had wrongly excluded Conroy. The trial court, however, had an insufficient basis on which to make that judgment. It was limited to comparing Conroy's offer of proof with Huse's testimony at trial. Such a comparison is not realistic because it does not account for the manner in which Conroy would have presented his opinion, an important element in establishing his credibility and ultimate effectiveness. I do not believe that two experts stand on equal footing before a jury merely because they share the same opinion. The defendant had the right to choose the expert whom he wanted without interference from the state or the court. It was improper to make the defendant use his second choice.

## III

### SANCTION

Even if it is assumed for the sake of argument that a technical violation had occurred, the preclusion of an important defense witness was an excessive sanction. More than a century ago, the United States Supreme Court held that a defense witness' violation of a sequestration order, without more, did not warrant his exclusion. *Holder* v. *United States,* 150 U.S. 91, 92, 14 S. Ct. 10, 37 L. Ed. 2d 1010 (1893). "Under the overwhelming weight of authority, it is an abuse of discretion to preclude a criminal defense witness's testimony for violation of a sequestration order unless special circumstances exist that would warrant the preclusion." *State* v. *Burke,* 522 A.2d 725, 729 (R.I. 1987). "Absent a showing of fault on the part of the party or counsel

who called a witness . . . a trial court should not deprive a criminal defendant of a witness' testimony solely because he violated a sequestration order." *Commonwealth* v. *Scott,* 496 Pa. 78, 82, 436 A.2d 161 (1981).

A similar exclusion question confronted the court in *State* v. *Boucino,* 199 Conn. 207, 214, 506 A.2d 125 (1986), wherein the defendant had not complied with the rules of practice pertaining to disclosure of an alibi defense. The *Boucino* court held that not every noncompliance with the rules justifies exclusion of the defendant's witnesses. "The trial court must weigh the need for exclusion against the defendant's right to present a defense. . . . The decision is within the sound discretion of the trial court and will turn on the facts of the particular case. Factors which the trial court must consider include: whether the disclosure violation was technical or substantial . . . the reason, if any, for the violation, the degree of prejudice to the parties respectively offering and opposing the evidence . . . ." (Citations omitted; internal quotation marks omitted.) Id.

The application of the *Boucino* test to the present case demonstrates that preclusion of Conroy's testimony was an excessive sanction and unconstitutionally deprived the defendant of the right to present a defense. "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense . . . . [The defendant] has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington* v. *Texas,* 388 U.S. 14, 19, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967); see note, "The Preclusion Sanction—A Violation of the Constitutional Right to Present a Defense," 81 Yale L.J. 1342, 1361 (1972).

I recognize, however, that exclusion of a defense witness' testimony based on a sequestration order violation is not a per se constitutional violation. *State* v.

*Boucino,* supra, 199 Conn. 213. "Whether a trial court's restriction of a defense witness' testimony in a criminal trial deprives a defendant of his due process rights is a question that must be answered on a case-by-case basis." *State* v. *Arbour,* 29 Conn. App. 744, 749, 618 A.2d 60 (1992) (discussing the exclusion of alibi witnesses). As previously stated, Conroy was to testify as an expert to challenge the claim that the victim sustained her injuries in the manner she claimed. As such, Conroy's testimony was an integral part of the defense. Requiring the defendant to locate, in the middle of the trial, another expert to testify on an issue of such importance was patently unfair. This midtrial preclusion of Conroy's testimony was a draconian penalty that impaired the defendant's ability to present a proper defense.

"If the error is of constitutional magnitude, then the burden is on the state to prove that this error was harmless beyond a reasonable doubt." *State* v. *Flanders,* 214 Conn. 493, 500, 572 A.2d 983, cert. denied, 498 U.S. 901, 111 S. Ct. 260, 112 L. Ed. 2d 217 (1990). In light of the importance to the defendant of Conroy's testimony, I do not believe the state has met its burden of showing the harmlessness of the error. I believe that requiring the defendant to find another expert unconstitutionally infringed on his right to present a defense.

This is particularly true in light of the numerous lesser sanctions that were available. The defendant suggests that the court could have "(1) instructed the jury that Dr. Quarishi did not have access to Dr. Conroy's testimony but Dr. Conroy had access to Dr. Quarishi's . . . (2) permitted cross-examination as to the extent to which Dr. Conroy was aided or influenced by the transcript . . . and (3) ordered that a transcript of Conroy's testimony be provided to any expert witness testifying for the state in rebuttal." I agree that any of these available alternatives was preferable to preclusion of the defendant's witness.

The majority concludes that because the defendant was able to locate another expert, any error in precluding Conroy's testimony did not rise to the level of a constitutional violation. Even if it is assumed that under the circumstances of this case the preclusion of Conroy's testimony did not rise to the level of a constitutional violation, I believe, as discussed in part II, that the defendant has met his burden of proving the harmfulness of the trial court's sanction. The defendant should have been able to utilize the expert of his choice, especially in light of the less drastic alternatives available and the absence of any evidence of the defendant's culpability in causing the alleged violation.

## IV

### CONCLUSION

I am not persuaded that the sequestration order was violated, but even if it was, the preclusion of the defendant's witness was an excessive sanction infringing on the defendant's right to present a defense. Moreover, I believe the defendant demonstrated the harmfulness of the trial court's error in imposing such a sanction.

I respectfully dissent from the majority on this issue and would reverse the decision and remand the case for a new trial.